571 P.2d 753

**LEMHI TELEPHONE COMPANY,**
Appellant,

v.

**MOUNTAIN STATES TELEPHONE AND
TELEGRAPH COMPANY, and Idaho
Public Utilities Commission, Respon-
dents.**

No. 11919.

Supreme Court of Idaho.

Sept. 21, 1977.

Rehearing Denied Dec. 9, 1977.

Paul B. Ennis of Hawley, Troxell, Ennis & Hawley, Boise, Delbert W. Johnson and Roger J. Crosby, Portland, Ore., for appellant.

Larry D. Ripley of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for Mountain States Tel. & Tel. Co.

Dan L. Poole, Asst. Atty. Gen., Boise, for Idaho Public Util. Comm.

McFADDEN, Chief Justice.

Lemhi Telephone Company is an independent telephone company which operates exchanges in Salmon and Leadore, Idaho, and Grant, Montana. Mountain States Telephone and Telegraph Company (Mountain Bell) is a telephone company which operates as a member of the Bell System in several western states, including that part of Idaho south of the Salmon River. Lemhi and Mountain Bell interconnect for purposes of long distance telephone service. This case arose out of a dispute over division of revenues derived from long distance telephone calls billed on Lemhi Telephone credit cards. The Idaho Public Utilities Commission ordered Lemhi to desist from issuing credit cards in certain situations, and to pay moneys to Mountain Bell in compensation for division of tolls made under past credit card practices. We set aside the order of the IPUC.

A contract entitled "Independent Company Traffic Agreement" was executed by Mountain Bell and Lemhi on May 7, 1970. Therein, the two companies agreed to connect their respective systems to allow transmission of long distance telephone messages. Division of long distance toll revenues would be determined according to a complex formula developed by the Bell System and set forth in the Traffic Agreement. The division of revenues with Lemhi, as with other independent companies, was designed to fit into the total Bell System long distance toll division procedure. Ostensibly, that method allots revenues to various companies commensurate to the cost of services and equipment incurred by each company in each message. Because it is impossible to pinpoint costs for individual calls, statistical averages are computed for cost components, and payments among companies are made in these average amounts on a per message basis; the amounts are termed "settlements." Various Bell companies across the land all contribute to a central pool and divisions are then divided and remitted to each company.

In the Traffic Agreement, Lemhi and Mountain Bell also provide for mutual billing procedures. Thus, a Lemhi customer making a call from a telephone in a Mountain Bell service area may bill his call to his Lemhi telephone. Similarly the two companies honor each other's telephone credit cards.

Lemhi receives a settlement amount for each call originating on a Bell System telephone but billed through Lemhi. Thus, if a call is made on a Bell System telephone, and is billed on a Lemhi credit card, Lemhi bills the customer, collects the toll, retains its settlement amount, and transmits the remainder of the toll to Mountain Bell, which in turn invokes the process described above to divide the amount among the appropriate Bell operating companies. Apparently, the process is based on the assumption that if a call originates on a Bell phone, but is billed to a Lemhi credit card, it will in most cases be made to a Lemhi exchange. The settlement amount is paid to Lemhi to compensate it for use of its equipment in receiving the call, and for its costs in billing. The assumption that most calls billed on Lemhi credit cards will be incoming to a Lemhi exchange is in turn premised on the assumption that Lemhi will issue credit cards only to persons who live or work in the Lemhi service area. Given these assumptions, the process is designed so that on an overall average basis, Lemhi will be compensated for its costs, and Mountain Bell will not pay settlement amounts to Lemhi except where it is probable that the call in some way involved Lemhi equipment.

To insure the integrity of the assumptions upon which the division is based, certain provisions are found in the Traffic Agreement. That agreement provides that the settlement amount paid to Lemhi will only be paid on messages "billed to credit cards issued in accordance with Industry recognized practices."[1] Further, the agree-

---

1. "5. *Methods and Practices*

"With respect to all matters covered by this Agreement, each company will adopt and comply with standard operating methods and practices comparable to those of the Bell System and will observe the rules and regulations of

ment stipulates that each company will adopt practices and operating procedures comparable to those of the Bell System.[2]

In March of 1970, Lemhi became a wholly owned subsidiary of Burlington Northern, Inc. In July of 1970, at the request of Burlington Northern, Lemhi issued telephone credit cards to various Burlington Northern personnel, who did not live or work in the Lemhi service area. Burlington Northern does not maintain offices nor conduct business in the Lemhi service area. The cards were then used by Burlington Northern personnel to charge calls originating and terminating at various points throughout the country. Few of the charged calls were to or from the Lemhi service area.

In September of 1973, Mountain Bell filed a formal complaint against Lemhi with the Idaho Public Utilities Commission. In the complaint, Mountain Bell alleged that Lemhi was in violation of the Traffic Agreement in issuing cards to Burlington Northern personnel for use around the country. The complaint noted that issuance of cards to persons outside of the service area of the company was, with some unrelated exceptions, contrary to industry practice. By issuing cards to Burlington Northern, Lemhi allegedly was causing messages totally unrelated to Lemhi service to be billed through Lemhi, thus allowing Lemhi to claim settlement amounts for messages which never utilized Lemhi equipment. Mountain Bell urged that as a result, settlement amounts were being paid to Lemhi when Lemhi was not entitled to the amount, and that the overall effect was to deprive it of the revenues paid to Lemhi. In the complaint, Mountain Bell claimed that the practice was "unfair, unreasonable, unjustly discriminatory and unduly preferential," and it asked for the return of the amounts paid in settlement to

Lemhi for messages billed on the Burlington Northern credit cards, and for an order preventing Lemhi from issuing credit cards outside of its service area.

Lemhi contended that the Commission did not have jurisdiction to consider the issues presented by Mountain Bell. The commission concluded that it did have jurisdiction, and ordered Lemhi to discontinue the practice of issuing credit cards to out-of-service-area persons. Additionally, the commission ordered Lemhi to repay moneys collected as settlement amounts from the Burlington Northern charges. Lemhi has appealed.

On appeal, Lemhi argues that the dispute as to the terms of the traffic agreement, and Lemhi's compliance therewith, is a contractual dispute and thus should be considered by the courts and not by the commission. Lemhi further argues that the commission lacks authority to order repayment of amounts already collected, as such orders are retrospective in nature; Lemhi argues that the Commission has only prospective powers when ordering division of revenues. We agree with Lemhi and will consider each argument in turn.

Initially, appellant asserts that the controversy between Lemhi and Mountain Bell is a contract dispute. The Traffic Agreement provides that Lemhi will receive settlements for messages billed on its credit cards, but only in instances where credit cards are issued in accordance with industry recognized practices. The basis of Mountain Bell's complaint is that Lemhi deviated from industry recognized practices when it issued cards to persons having no connection with the Lemhi service area. Lemhi argues that the essence of the Mountain Bell position is that Lemhi violated the

the lawfully established tariffs applicable to the services provided.

"Each company will, upon request, furnish to the other such information relating to the business covered herein as may reasonably be required."

2. "A TOLL CREDIT CARD MESSAGE or a toll message to be billed to a third telephone will be treated as 'sent-collect' at the telephone where

it originates and 'received-collect' at the telephone where it is billed, except that if the charges are to be billed to another telephone in the same exchange in which the message originates such message shall be treated as 'sent-paid'. This treatment shall apply only to messages billed to credit cards issued in accordance with Industry recognized practices."

contract. Lemhi further characterizes Mountain Bell's request for repayment as a claim for damages resulting from the breach of contract. Contract disputes, Lemhi urges, are matters for the courts and not the commission. Mountain Bell, on the other hand, characterizes the dispute as one over division of tolls and asserts that the commission is the only body which may hear a dispute between two utilities over division of rates and tolls.

▪ In addressing the question of whether this dispute is one for the courts or the commission, we first observe several general tenets which guide the proper assignment of this matter into one body or the other. First, it will be remembered that the commission is vested with the jurisdiction to regulate and supervise public utilities in the state, I.C. § 61–501, and would appear to have primary jurisdiction in the matter. In such instances, the case is rightly taken to the Public Utilities Commission and not to court. *Grever v. Idaho Telephone Co.,* 94 Idaho 900, 499 P.2d 1256 (1972). However, it should be noted that

> "The doctrine of primary jurisdiction is not an inflexible mandate, but rather is predicated on an attitude of judicial self-restraint, and is generally applied when the court believes that consideration of policy recommends that the issue be left to the administrative agency for initial determination." *Grever v. Idaho Telephone Co., supra* at 902.

Thus, that the commission appears at first blush to be vested with general jurisdiction over utilities may be persuasive but is not controlling.

▪ The Public Utilities Commission has no inherent power; its powers and jurisdiction derive in entirety from the enabling statutes, and "nothing is presumed in favor of its jurisdiction." *Arrow Transp. Co. v. Idaho Public Utilities Comm'n,* 85 Idaho 307, 379 P.2d 422 (1963). See, also, *Tri-County Electric Assoc. v. City of Gillette,* 525 P.2d 3 (Wyo.1974); *Chicago, Burlington & Quincy RR Co. v. Iowa State Commerce Comm'n,* 252 Iowa 318, 105 N.W.2d 633 (1960); *General Telephone Co.*

*of Indiana v. Public Service Comm'n,* 238 Ind. 646, 150 N.E.2d 891 (1958); *Ohio Central Telephone Corp. v. Public Utilities Comm'n,* 166 Ohio St. 180, 140 N.E.2d 782 (1957). However, while jurisdiction of the Commission is to be strictly construed, once jurisdiction is clear, the Commission is allowed all power necessary to effectuate its purpose. "Every power expressly granted, or fairly to be implied from the language used, or necessary to enable the commission to exercise the powers expressly granted should be afforded." 64 Am.Jur.2d, Public Utilities, § 232 (1972).

Keeping these general precepts in mind, we turn to the circumstances of the instant case. It is apparent that the dispute between Lemhi and Mountain Bell stems initially from the language of the Traffic Agreement. Mountain Bell's claim for a refund of the amounts paid is based on that language of the agreement that settlements need be paid only when credit cards are issued pursuant to industry recognized practices. Mountain Bell's claim that Lemhi should be stopped from issuing cards to persons outside its service area is based on the contractual provision that each company will adopt practices similar to those of the Bell System. In sum, it is clear that the matter is in all manners one calling for interpretation and enforcement of the parties' contractual rights.

▪ Generally, construction and enforcement of contract rights is a matter which lies in the jurisdiction of the courts and not the Public Utilities Commission. This is true notwithstanding that the parties are public utilities or that the subject matter of the contract coincides generally with the expertise of the commission. If the matter is a contractual dispute, it should be heard by the courts. *New York, Susquehanna & Western R. Co. v. Follmer,* 254 F.2d 510 (3d Cir. 1958); *Gibson v. City Telephone Co.,* 411 P.2d 551 (Okl.1966); *Sydnor Pump and Well Co. v. Taylor,* 201 Va. 311, 110 S.E.2d 525 (1959); *Appalachian Power Co. v. John Stewart Walker, Inc.,* 214 Va. 524, 201 S.E.2d 758 (1974); *Katz Drug Co. v. Kansas City Power and Light Co.,* 303 S.W.2d 672

(Mo.App.1957); *Williams Electric Co-op v. Montana-Dakota Utilities Co.*, 79 N.W.2d 508 (N.D.1956); *State ex rel. Gehrs v. Public Service Comm'n*, 232 Mo.App. 1018, 114 S.W.2d 161 (1938); *Irwin v. Public Utility Comm'n*, 142 Pa.Super. 157, 15 A.2d 547 (1940); *California Water and Telephone Co. v. California Pub. Util. Comm'n*, 51 Cal.2d 478, 334 P.2d 887 (1959).

This is not to say that the Public Utilities Commission is without authority and jurisdiction to affect contracts. The power of the IPUC to deal with contractual relationships was discussed at some length in the recent case of *Agricultural Products v. Utah Power and Light Co.*, 98 Idaho 23, 557 P.2d 617 (1976). Therein this court said:

"Private contracts with utilities are regarded as entered into subject to reserved authority of the state to modify the contract in the public interest.

However, the power to alter a rate contract is not unlimited. The United States Supreme Court noted in *Arkansas Natural Gas Co. v. Arkansas R.R. Comm'n*, 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), that:

'While a state may exercise its legislative power to regulate public utilities and fix rates notwithstanding the effect may be to modify or abrogate private contracts * * *. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed the exertion of legislative power solely to that end is precluded by the contract impairment clause of the Constitution. The power does not exist per se. *It is the* intervention *of the public interest which justifies and at the same time conditions its exercise.*' 261 U.S. 379, 43 S.Ct. at 388. [emphasis in original]

To justify state interference with the utility contract, there must be a finding that the rate 'is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.' *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)."

Before the Public Utilities Commission may involve itself with a contract between two utilities, it must find specifically that the contract is adverse to the public interest; here, a finding that the interpretation placed on the contract by Lemhi adversely affected the public interest would be required. No such finding is present.

The IPUC argues that the settlement amounts are additional revenues for Lemhi, that as such they operate to the benefit of the parent corporation, Burlington Northern, and that the result is, in effect, lower rates for Burlington Northern. Thus, the commission contends that the contract interpretation and the issuance of credit cards created an unreasonable discrimination in favor of Burlington Northern, thus bringing the controversy under the purview of I.C. § 61-315.

However attractive such a proposition may appear at first blush, it is ultimately unconvincing. By this reasoning, any time a corporate stock owner is also a user of the company's product, any revenue producing procedure would be said to operate to the benefit of the stock owner by increasing his income. The commission would then construe the customer's stock income as a reduction of the customer's rates, and would consider it to be an illegal discrimination justifying commission intervention. By this reasoning, the commission would find a basis for jurisdiction to deal with *any* revenue producing procedure so long as one customer also holds stock. We refuse to adopt such an illogical position.

The commission further asserts authority to determine the division of rates based upon I.C. § 61–513.[3] That section

---

**3.** "61–513. Telephone and telegraph companies—Physical connections.—Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that a

empowers the commission to order that two telephone companies effectuate a connection when it is found to be in the public interest. When the two companies "have failed" to establish joint rates, the commission may order joint rates. The statutory language is unambiguous. It expresses a clear preference that the companies agree between themselves. Only if the utilities fail to agree may the commission enter the picture. *Public Service Comm'n v. Skagit River Telephone and Telegraph Co.*, 89 Wash. 625, 155 P. 144 (1916). Here, the two companies did not "fail" to agree upon connections and joint rates. While there is a question as to construction of the agreement, its existence is certain. Absent a failure to agree, the only justification for commission jurisdiction is if it is found that the agreement is contrary to public interest. In that case, of course, the commission may intervene. *Oklahoma-Arkansas Tel. Co. v. Southwestern Bell T. Co.*, 143 Okl. 76, 291 P. 3 (1930). Here, as noted above, there is no finding that the agreement, under either company's interpretation, is contrary to public interest. Because the companies did not "fail" to agree upon the terms of connection, and because there is no finding that the agreement is contrary to public interest, we conclude that I.C. § 61–513 does not empower the commission to intervene in this case.

The commission did not make a finding which would allow a conclusion of adversity to public interest. It lacked authority to construe or enforce the contract. We must therefore set aside the order of the Idaho Public Utilities Commission.

Appellant next contends that the commission had no authority to order repayment of the settlement amounts already collected as a result of charges on Burlington Northern credit cards. The commission, in ordering such repayment, relied on two Idaho Code sections: I.C. § 61–513 and I.C. § 61–641. We consider each in turn.

 The commission again asserts authority based on I.C. § 61–513. As noted above, the statute allows two companies to agree between themselves upon terms of connections. If the companies fail to agree, the Commission may order joint rates, tolls and charges "to be used, observed and in force in the future." If the two companies do agree upon division of those rates, then the Commission, "after further hearing," may establish division of rates "by supplemental order." Clearly, the legislature intended to allow the Commission authority only to prospectively determine rates. If, after rates are set, the two companies cannot agree upon the division, the commission may then hold further hearings and, by supplemental order, make the necessary division of income arising from these rates. Thus, the statute similarly authorizes only prospective division of income from rates, with failure of agreement between the companies a condition precedent to the authority. As discussed above, the two companies have not failed to agree; they specifically did reach an agreement. The commission thus does not obtain jurisdiction based on I.C. § 61–513.

physical connection can reasonably be made between the lines of two (2) or more telephone corporations or two (2) or more telegraph corporations whose lines can be made to form a continuous line of communication, by the construction and maintenance of suitable connections for the transfer of messages or conversations, and that public convenience or necessity will be subserved thereby, or shall find that two (2) or more telegraph or telephone corporations have failed to establish joint rates, tolls or charges for service by or over their said lines and that joint rates, tolls or charges ought to be established, the commission may, by its order, require that such connections be made, and

that conversations be transmitted and messages transferred over such connection under such rules and regulations as the commission may establish, and prescribe through lines and joint rates, tolls and charges to be made, and to be used, observed and in force in the future. If such telephone or telegraph corporations do not agree upon the division between them of the cost of said physical connections or connections of the division of the joint rates, tolls or charges established by the commission over such through lines, the commission shall have authority after further hearing, to establish such division by supplemental order."

It should be noted that if either party desired to have the terms of the connection supervised by the commission, it could have refused to contract, and thus have invoked the commission's participation. When the contract was initially entered into, however, each party apparently desired to be free from commission overview. When each makes this choice, one may not now come before the commission, and request an order for the return of moneys paid under that contract prior to commission review.

In construing a similar statute, the United States Supreme Court noted:

"The power to require readjustments for the past is drastic. It may reasonably exist in cases where the particular rate has been approved by the Commission after full hearing; it ought not to be extended so as to permit unreasonably harsh action without very plain words. The general findings and permission of Ex parte 74 and Matter of Reduced Rates did not approve or fix any particular rate and certainly did not determine and prescribe the rates divisions of which are here under consideration. * * *

Section 15(1) Transportation Act 1920, authorizes the Commission, after full hearing, to determine and prescribe joint rates to be thereafter observed. Section 15(3) permits the Commission, after full hearing, to establish joint rates 'and the divisions of such rates, fares, or charges as hereinafter provided.' And section 15(6) authorizes readjustments of divisions already received only when the joint rate was established pursuant to a finding or order must have been under section 15(1) or (3) after full hearing in respect to the specific rate. This construction will insure compliance with the purpose of Congress by requiring the Commission, upon full hearing, to pass upon the particular rate before divisions for the past can be directed." *Brimstone R. & Canal Co. v. U.S.*, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928).

■ A lengthy discussion of this issue, with the same result is presented by the California Supreme Court in *Pacific Telephone & Tel. Co. v. Public Utilities Comm'n*, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353 (1965). When the two contracting parties have, by choice, not previously presented the terms of the contract to the commission for approval, one may not now come before the commission and request a retrospective disapproval of the interpretation placed on the contract by the other party, with concomitant order of repayment.

The commission next suggests that jurisdiction and authority to order repayment may be premised upon I.C. § 61–641.[4] The section ostensibly authorizes the commission to order reparations of any rate, fare, toll, rental or charge. However, it may do so only if it finds the utility charge was "excessive or discriminatory." We have already discussed the commission's assertion that the Lemhi division was discriminatory, and have concluded that it was not. The question remaining is whether it may be said that the division urged by Lemhi is excessive.

■ Lemhi's position may result in a division of revenues which is excessive in terms of the contract. This, however, does not bestow jurisdiction on the commission because, as we have noted, the commission may interpret contracts only when the public interest is adversely affected.

■ Before the commission may order reparations pursuant to I.C. § 61–641, it must find rates which are excessive in light of the public's best interests. No finding to this effect is here present. Thus, no authority to order repayment may be discerned in this case from I.C. § 61–641.

4. "§ 61–641. Overcharge—Reparation.— When complaint has been made to the commission concerning any rate, fare, toll, rental or charge for any product, or commodity, furnished or service performed by any public utility, and the commission has found, after investigation, that the public utility has charged an excessive or discriminatory amount for such product, commodity or service, the commission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection: provided, no discrimination will result from such reparation."

The commission lacked authority to order Lemhi to cease its credit card practices. The commission did not review the contract in the first place and is not now the proper body to evaluate the proper meaning to be attributed to the document. Mountain Bell should have had the issue of contract interpretation and breach decided by the proper court. The commission lacked authority to order repayment of amounts retained by Lemhi under its interpretation of the agreement, absent a finding that the public interest had been adversely affected by Lemhi's actions. The order of the Idaho Public Utilities Commission is therefore set aside. Costs to appellants.

DONALDSON, BAKES and BISTLINE, JJ., concur.

SHEPARD, Justice, dissenting.

The very foundation of the public utility concept is that a monopolistic supplier of a commodity or service to the public should be regulated in the rates and tariffs it may charge the public. The corollary of that proposition is that since rates are regulated a public utility must be allowed a fair rate of return. That rate of return is calculated upon the various costs incurred in the furnishing of the service or the supplying of the commodity. It was for those reasons that the statutes governing public utilities were enacted and the Public Utilities Commission was created. Among the duties of that commission are to determine rates which are just and reasonable. Correlatively unjust and unreasonable charges are prohibited and declared unlawful. I.C. §§ 61–301, 61–302. Rates granting preference or advantage or creating prejudice or disadvantage are prohibited and the Public Utilities Commission is specifically granted the power to determine any such question of fact. I.C. § 61–315.

The essence of the holding of the majority is "Lemhi's position may result in a division of revenues which is excessive in terms of the contract. This, however, does not bestow jurisdiction on the commission because, as we have noted, the commission may interpret contracts *only when the public interest is adversely affected.*" (emphasis supplied). Therein the majority allows Lemhi Telephone Company *and its subscribers* a financial advantage and/or rate preference over every other connecting telephone company *and their subscribers and rate payers.* As a necessary corollary Mountain States and its subscribers and rate payers are prejudiced and disadvantaged.

In its complaint Mountain Bell alleged that the procedure utilized by Lemhi had resulted in an "unfair, unreasonable, discriminatory and unduly preferential apportionment of toll revenues" to the detriment of that portion of the public using the services of Mountain Bell and other companies with which Mountain Bell connects. The commission, pursuant to its authority set forth in I.C. § 61–315, found as a fact that the procedure of Lemhi was unfair, unjustly discriminatory, unduly preferential and in violation of § 61–315, Idaho Code.

It further found that such procedure resulted in excessive and discriminatory charges. It further found that Lemhi's revenues were increased and such increased revenues bore no relation to any increase in costs to Lemhi.

It would be difficult to postulate a more compelling set of facts to demonstrate the necessity of commission action in the protection of the public interest. To hold as does the majority that a utility may engage in a practice which confers an unjust and discriminatory preference to some and imposes an unjust prejudice and disadvantage to others because the public interest is not adversely affected is in my judgment a departure from the world of reality.

As the Chief Justice wrote for a unanimous Court a scant eight months ago in *Agricultural Products v. Utah Power and Light Company,* 98 Idaho 23, 557 P.2d 617 (1976):

"On the other hand, the state has a well established right to regulate public utilities. * * * Pursuant to that power, it has been settled that the state may fix

rates for public utilities service which will supersede rates previously fixed by private contract. Interference with private contracts by the state regulation of rates is a valid exercise of the police power, and such regulation is not a violation of the constitutional prohibition against the impairment of contractual obligations. * * * Private contracts with utilities are regarded as entered into subject to reserved authority of the state to modify the contract in the public interest."

The Court then went on to point out that while the Public Utility Commission has the authority to "annul or supersede contract rates" that power is not unlimited and "it is the intervention of the public interest which justifies and, at the same time conditions its exercise." It was further noted that public utility commission interference with contract rights must be based on a finding by the commission that it "casts upon other consumers an excessive burden or be unduly discriminatory."

Although the majority labors mightily with the problem of "an unreasonable discrimination in favor of Burlington Northern," such is completely beside the point. Whether the Burlington Northern is the parent corporation of Lemhi and if any of the monies were thus unfairly paid to Burlington Northern are facts which have no bearing on the ultimate question. The practice of Lemhi as found by the commission resulted in an unjust, unfair and discriminatory preference. What Lemhi did or did not do with those windfall revenues may be of concern to the corporate ownership but not to the general public and its statutory protector, the Public Utilities Commission.