693 P.2d 427

**AFTON ENERGY, INC., Complainant,**

v.

**IDAHO POWER COMPANY,
Respondent.**

**IDAHO POWER COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMIS-
SION and Afton Energy, Inc.,
Respondents.**

No. 14777.

Supreme Court of Idaho.

Jan. 11, 1984.

On Rehearing Dec. 20, 1984.

Larry D. Ripley, Barton L. Kline, III, and Bruce H. Tompkins, Boise, for respondent-appellant.

Owen H. Orndorff, Boise, for complainant-respondent Afton Energy.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and John J. McMahon, Deputy Atty. Gen., (argued), Boise, for respondent Idaho Public Utilities Com'n.

Robert M. Turnbow and David G. Gadda (argued), Boise, for intervenor Independent Power Producers Council.

Wynne M. Blake, Lewiston, for amicus curiae American Paper Institute, Inc.

HUNTLEY, Justice.

The basic issue presented today is whether the Idaho Public Utilities Commission (Commission) has authority to order an electric utility to purchase power from a cogenerator or small power producer (CSPP) for a fixed term according to avoided cost rates previously approved by the Commission.

On July 19, 1982, Afton Energy, Inc. (Afton), filed a complaint with the Commission alleging that Idaho Power had intentionally and deliberately protracted the negotiations for the purchase of its power and had continuously employed tactics designed to discourage Afton and destroy its efforts to complete financing of its cogeneration project to be located in Afton, Wyoming.[1] The complaint requested the Commission to "immediately order Idaho Power to enter into the attached power sales agreement and to furthermore cooperate in good faith and in an expeditious manner to consummate the sale of its power to Idaho Power." R., p. 3.

July 28, 1982, Idaho Power filed an answer to the Afton complaint and alleged that the Commission had no jurisdiction to order Idaho Power to sign the contract attached to the Afton complaint which was not freely negotiated but rather was a standard form contract with terms dictated by the Commission.

The Commission issued its ruling on the Afton complaint by Order No. 17478 on August 3, 1982. The Commission stated that Idaho Power was in fact correct in its assertion that it lacked jurisdiction to order Idaho Power to enter into the specific agreement attached to Afton's complaint or to dictate contract terms between a utility and a CSPP,[2] noting that:

"The role of standard form contracts was to serve as 'a solid point of departure for negotiations.' It has been our experience that sponsors of projects are greatly assisted in their initial planning efforts

---

1. Afton Energy is a corporation formed for the purpose fo building, owning, and operating a cogeneration plant to be fueled by wood waste from a large lumber mill. The plant will be .6.5 megawatts in capacity and will generate approximately 52,000,000 kilowatt hours of electricity annually.

2. Thus we are not here concerned with the Commission's authority to order utilities to enter into standard non-negotiated form contracts. The only question addressed by this opinion is the Commission's authority to order utilities to enter into fixed term contracts to purchase a CSPP's output at avoided cost rates previously approved by the Commission.

and their dealings with potential financial backers if the rates, terms and conditions governing future relations with the purchasing utility can be made available at the outset with at least some degree of assurance. It makes no sense to reinvent the wheel with each project. Nonetheless, the parties remain free to negotiate whatever terms make sense in light of the unique circumstances of each site's specific application." R., p. 70. The Commission, however, held that it did have the authority and indeed the duty pursuant to the Public Utility Regulatory Policies Act (PURPA) § 210 (16 U.S.C. § 824a–3) to require utilities to purchase power pursuant to firm agreements with CSPP's. The Commission thereby ordered Idaho Power to "agree to purchase from Afton Energy, Inc., cogenerated power in the amount and for the time period tendered by Afton,[3] at the avoided cost rates for Idaho Power Company that have previously been prescribed and approved by this Commission and that are currently in effect."[4] R., p. 84.

On August 11, 1982, Idaho Power filed with the Commission a compliance filing and request for order which provided that: "As is set forth in ARTICLE XIII of the contract, there remains a legal dispute between Idaho and Afton but such dispute has not prevented the execution of the Contract." R., p. 111. The parties then set forth terms and conditions which would apply depending upon this Court's determination of the Commission's authority. The contract was approved by the Commission in Order No. 17495 dated August 17, 1982. Idaho Power petitioned for rehearing of this order on September 1, 1982, which petition was denied by the Commission on September 29, 1982. This appeal followed.

## I. PURPA § 210

■ The Commission found its authority to order Idaho Power to "agree to purchase from Afton Energy, Inc., cogenerated power in the amount and for the time period tendered by Afton, at [previously prescribed avoided cost rates]," under PURPA § 210.

In 1978, this country was faced with an energy shortage which threatened the economic well-being of the entire country. At that time, the generation of electricity consumed more than twenty-five percent of all energy resources used in the United States. In part because of their reliance on oil and gas, electric utilities were plagued with increasing costs and decreasing efficiency in the use of their generating capacities. "Congress accordingly determined that conservation by electric utilities of oil and natural gas was essential to the success of any effort to lessen the country's dependence on foreign oil, to avoid a repetition of the shortage of natural gas that had been

---

3. Afton proposed to sell energy to Idaho Power for thirty-five years. The thirty-five year period represents the time period pursuant to which CSPPs can receive the maximum rate per kilowatt hour "avoided" by Idaho Power. The thirty-five year period corresponds to the life of Idaho Power's own thermal unit that can be "avoided" by purchasing power from the CSPP. See Appendix A.

4. The Commission, acting under the mandate of PURPA § 210(b), FERC regulation § 292.304(a) and its own ratemaking authority, held hearings in June of 1980 to determine the avoided cost rates that should be paid by Idaho electric utilities for the purchase of power from CSPPs. The Commission issued Order No. 16025 on December 2, 1980, which directed Idaho Power and Washington Water Power to submit offerings detailing the prices and conditions under which they would purchase power from CSPPs. Idaho Power complied with this Order on January 13, 1981, by submitting the avoided cost rates, tariffs and standard form contract provisions under which it would deal with CSPPs. Order No. 16025 provides a rate schedule having fixed and variable payments. Fixed payments remain stable throughout the life of the contract and represent the capacity costs associated with providing the capability to deliver energy and consist primarily of the capital costs of the facilities. Variable costs are the energy costs associated with the production of energy. They represent the cost of fuel, and some operating and maintenance expenses and are allowed to fluctuate over the life of the contract. R., p. 79. See R., pp. 24–28 (CSPP Schedule of Power Purchase Prices).

The question of the reasonableness of the avoided cost rates approved by the Commission in order No. 16025 is not before this Court on appeal.

experienced in 1977, and to control consumer costs." *Federal Energy Regulatory Commission (FERC) v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982). PURPA was designed to alleviate three problems: (1) utilities were not generally required to purchase electric output from CSPPs at reasonable rates; (2) some utilities charged discriminatorily high rates for back-up service to CSPPs; and (3) CSPPs which provided electricity to utilities ran the risk of being considered electric utilities and thus being subjected to state and federal regulation as electric utilities. 45 Fed.Reg. 12215.

Idaho Power argues that PURPA does not confer authority upon the Commission independent of that granted under the Idaho Public Utilities Law, and that therefore the Commission has no authority to require Idaho Power to contract with Afton. That argument misstates the issue.

The Commission is the agency authorized and directed by statute to regulate public utilities. Its statutory authority specifically includes the power to approve or disapprove proposed generating facilities and to regulate those matters which impact utility rates. In this instance the federal government is permitting the Commission to further certain federal policies through the performance of those functions the Commission is authorized to perform under Idaho statutes.

I.C. § 61–501 provides:

"**Investment of authority.**—The public utilities commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things necessary to carry out the spirit and intent of the provisions of this act."

Section 61–526 provides that the Commission has the power to approve or disapprove proposed generating plants.

"**Certificate of convenience and necessity.**—No ... electrical corporation ... shall henceforth begin the construction ... of a line, plant, or system or of any extension of ... line, plant, or system, without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction: ... and provided further, that ... if public convenience and necessity does not require or will require such construction or extension, the commission on complaint of the public utility claiming to be injuriously affected, or on the commission's own motion, may, after hearing, make such order and prescribe such terms and conditions for the locating or type of the line, plant or system affected as to it may seem just and reasonable: ..."

I.C. § 61–508 further provides in part as follows:

"Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that additions, extensions, repairs or improvements to or changes in the existing plant, ... facilities or other physical property of any public utility ... ought reasonably to be made, or that a new structure or structures should be erected, ... the commission shall make and serve an order directing such additions, extensions, repairs, improvements, or changes be made or such structure or structures be erected in the manner and within the time specified in said order."

I.C. § 61–129 declares that public utilities are subject to "the jurisdiction, control and regulation of the Commission"; I.C. § 61–612 gives the Commission jurisdiction to hear complaints against utilities alleging violations of rules, regulations or of any provision of law; I.C. § 61–502 gives the Commission jurisdiction to determine reasonable rates, including rates collected under contracts; and I.C. § 61–503 gives the Commission power to investigate a single contract or an entire schedule of contracts of any public utility and to establish new contracts in lieu thereof.

PURPA § 210(f) provides that "each State regulatory authority *shall* ... implement such [FERC] rule ... for each electric utility for which it has ratemaking

authority."[5] FERC's regulations interpret this provision to require that state "implementation may consist of the issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities arising under Subpart C, or any other action reasonably designed to implement such subpart...." 18 C.F.R. § 292.401(a) (1980). Moreover, the United States Supreme Court has interpreted PURPA as imposing requirements on state regulatory authorities in excess of their duties under state law. In *FERC v. Mississippi,* the Supreme Court stated that through PURPA the federal government attempted to use state regulatory machinery to advance federal goals. The Court held constitutional the requirement of § 210 which "has the States enforce standards promulgated by FERC." *Id.* 102 S.Ct. at 2137. Thus, it is clear that PURPA was intended to confer upon state regulatory commissions responsibilities not conferred under state law.

### A. Authority to Order Utilities to Enter into Fixed Term Contracts.

 PURPA § 210(a) requires FERC to "prescribe ... such rules as it determines necessary to encourage cogeneration and small power production which rules

require electric utilities to offer to ... purchase electric energy from [CSPPs]."[6] In compliance with this provision, FERC issued regulation 18 C.F.R. § 292.303(a) which provides that "[e]ach electric utility shall purchase, in accordance with § 292.-304, any energy and capacity which is made available from a qualifying facility." Section 292.304(d) provides that:

"Each qualifying facility shall have the option either:

"(1) To provide energy as the qualifying facility determines such energy to be available for such purchases ...; or

"(2) To provide energy or capacity *pursuant to a legally enforceable obligation* for the delivery of energy or capacity *over a specified term ....*" (Emphasis added.)

This provision gives the CSPP the option to enter into a contract for a specified term with a utility or to provide energy to the utility as it becomes available to the CSPP.[7] Similarly, it can be seen that 18 C.F.R. § 292.304(e)(iii) which provides that one of the factors in determining the avoided cost rates to be paid the CSPP is "[t]he terms of any contract or other legally enforceable obligation, including the *duration of the obligation* ..." (emphasis added),[8] envi-

---

5. The House and Senate conferees interpreted PURPA as "affect[ing] certain activities which have traditionally been subject to primary regulation by the States.... The conference substitute does not change the primary responsibility of the State with respect to electric utility rates, but it places certain Federal responsibilities and obligations on the State commissions in the exercise of their responsibilities...." 1978 U.S. Code Cong. & Ad.News 7659, 7801.

6. It is clear that the drafters of PURPA envisioned that utilities would be required to enter into fixed term contracts. In the conference committee's report on PURPA, the conferees stated that they

"expect that the Commission, in judging whether the electric power supplied by the cogenerator or small power producer will replace future power which the utility would otherwise have to generate itself either through existing capacity or additions to capacity or purchase from other sources, will take into account the reliability of the power supplied by the cogenerator or small power producer by reason of any *legally enforceable obligation* of such cogenerator or small power

producer to supply firm power to the utility." 1978 U.S.Code Cong. & Ad.News 7833 (emphasis added).

7. FERC's intent that CSPPs, at their option, could enter into fixed-term contracts is manifested by this comment to § 292.304:

"A facility which enters into a *long-term contract* to provide energy or capacity to a utility may wish to receive a greater percentage of the total purchase price during the beginning of the obligation. For example, a level payment schedule from the utility to the qualifying facility may be used to match more closely the schedule of debt service of the facility. So long as the total payment over the duration of the *contract term* does not exceed the estimated avoided costs, nothing in these rules would prohibit a state regulatory authority or non-regulated electric utility from approving such an arrangement." 45 Fed.Reg. 12224 (1980) (emphasis added).

8. The level of payments to the CSPP varies depending on the length of the contract. Mathematically, the rate level is a function of the term

sions that utilities and CSPPs will enter into fixed-term contracts. Thus, it is clear that the Commission had the authority to order Idaho Power to enter into a fixed-term obligation to purchase energy from Afton. We hold that the Commission did not abuse its discretion in implementing the mandates of PURPA by requiring Idaho Power to contract with Afton for the purchase of its power over a thirty-five year period.[9] In the absence of an abuse of discretion, this Court will not set aside orders of the Commission. *Boise Water Corporation v. Idaho Public Utilities Commission*, 97 Idaho 832, 555 P.2d 163 (1976); *Intermountain Gas Company v. Idaho Public Utilities Commission*, 97 Idaho 113, 540 P.2d 775 (1975).

### B. Fixed Rates

■ The contract approved by the Commission provided that the Commission could only modify the terms and/or conditions thereof if such was necessary in the public interest. The public interest test approved by the Commission is the standard set forth by this Court in *Agricultural Products Corp. v. Utah Power & Light Co.*, 98 Idaho 23, 557 P.2d 617 (1976), pursuant to which contractually established rates may be superseded by the Commission. The Court in *Agricultural Products* held that although the Commission could supersede contract rates between utilities and their customers pursuant to the state's police power, such power was limited by the requirement that such be in the public interest. "To justify state interference with the utility contract, there must be a finding that the rate 'is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden,

or be unduly discriminatory.'" *Id.* at 29, 557 P.2d at 623 (quoting *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)). The public interest standard approved by the Commission in this case is merely the standard pursuant to which any rate contract may be superseded by later Commission orders.

Idaho Power proposed to amend the contract to provide that:

"The rates, terms and conditions set forth in this agreement are subject to the *continuing jurisdiction* of the Idaho Public Utilities Commission. The rates, terms and conditions under this agreement are subject to change and revision by order of the Commission upon a finding, supported by substantial competent evidence, that such rates, terms or conditions, change or revision is just, fair, reasonable, sufficient, nonpreferential and non-discriminatory." R., p. 81 (emphasis added).

Idaho Power argues that the Commission is required pursuant to I.C. § 61–502[10] to determine the "just, reasonable and sufficient rates" to be paid the CSPP, which rates of necessity must be subject to change as conditions do and that by approving a contract which sets forth the more stringent "public interest" standard for modification of rates, the Commission has abdicated its responsibility of reviewing and ensuring that utility rates remain "just, reasonable and sufficient" under this provision.

In making this argument, Idaho Power ignores the express provisions of PURPA, its legislative history and its implementing FERC regulations.

PURPA § 210(b) provides that:

---

of the contract. Thus, the Commission's ratemaking authority is intricately related to its ability to define the term of the obligation. See Appendix A.

**9.** *See* note 3 *supra.*

**10.** *I.C.* § 61–502 provides that:
"Whenever the commission ... shall find that the rates ... demanded, observed, charged or

collected by any public utility ... are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges ... or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed ...."

"The rules prescribed under subsection (a) of this section shall insure that in requiring any electric utility to offer to purchase energy from any [CSPP], the rates for such purchase—

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, ...."

The House and Senate conferees explicitly stated in their report on the PURPA bill that this language was not to be interpreted to permit pervasive regulation by state utility commissions over the avoided cost rates paid CSPPs by utilities:

"The conferees intend that the phrase 'just and reasonable to the electric consumers of the utility' be interpreted in a manner which looks to protecting the interests of the electric consumer in receiving electric energy at equitable rates. It is not the intention of the conferees that cogenerators and small power producers become subject, by virtue of this language, and the rules promulgated under this section, to the type of examination that is traditionally given to electric utility rate applications to determine what is the just and reasonable rate that they should receive for their electric power. The conferees recognize that cogenerators and small power producers are different from electric utilities, not being guaranteed a rate of return on their activities generally or on the activities vis a vis the sale of power to the utility and whose risk in proceeding forward in the cogeneration or small power production enterprise is not guaranteed to be recoverable.

"The conferees wish to make clear that cogeneration is to be encouraged under this section and therefore the examination of the level of rate which should apply to the purchase by the utility of the cogenerator's or small power producer's power should not be burdened by the same examination as are utility rate applications, but rather in a less burdensome manner. *The establishment of utility type regulation over them would act as a significant disincentive to firms interested in cogeneration and small power production.*" 1978 U.S. Code Cong. & Ad. News 7831–32 (emphasis added).

The contractual language proposed by Idaho Power would result in utility-type regulation over CSPPs, a result clearly rejected by Congress when it enacted PURPA.

The FERC regulations implementing PURPA similarly do not contemplate utility-type regulation over rates paid to CSPPs. 18 C.F.R. § 392.602(c) provides that "any qualifying facility shall be exempted ... from State law or regulation respecting: (i) The rates of electric utilities; and (ii) The financial and organizational regulation of electric utilities."

18 C.F.R. § 292.304(d) provides that CSPPs have the option of having their power purchased under two types of rate schedules:

"(i) The avoided costs calculated at the time of the delivery; or

"(ii) The avoided costs *calculated at the time the [legally enforceable obligation for the delivery of energy or capacity over a specified term] is incurred.*"[11] (Emphasis added.)

---

**11.** FERC's comments explain this provision:

"Paragraph (b)(5) and (d) are intended to reconcile the requirement that the rates for purchases equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future avoided costs. Some of the comments received regarding this section stated that, if the avoided costs of energy at the time it is supplied is less than the price provided in the contract or obligation, the purchasing utility would be required to pay a rate for purchases that would subsidize the qualifying facility at the expense of the utility's other ratepayers. The commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. The Commission does not believe that the reference in the statute to the incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between qualifying facilities and electric utilities." 45 Fed.Reg. 12224.

FERC's comments make it clear that if the CSPP chooses to exercise its option to receive avoided costs calculated at the time the obligation is incurred, that rate is to be maintained for the duration of the contract:

"Paragraph (b)(5)[12] addressed the situation in which a qualifying facility has entered into a contract with an electric utility, or where the qualifying facility has agreed to obligate itself to deliver at a future date energy and capacity to the electric utility. The import of this section is to ensure that a qualifying facility which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances. This provision can also work to preserve the bargain entered into by the electric utility; should the actual avoided costs be higher than those contracted for, the electric utility is nevertheless entitled to retain the benefit of its contracted for, or otherwise legally enforceable, lower price for purchases from the qualifying facility. This subparagraph will thus ensure the certainty of rates for purchases from a qualifying facility which enters into a commitment to deliver energy or capacity to utility." 45 Fed.Reg. 12224.

Thus we reject Idaho Power's argument that the Commission does not have any authority to establish an avoided cost rate which is fixed for the duration of the contract and which is not subject to the Commission's continuing jurisdiction. It is clear that both Congress and FERC, through its implementing regulations, intended that CSPPs should not be subjected to the pervasive utility-type regulation which would result if the contract language proposed by Idaho Power were approved by the Commission. In fact, one of Congress' main objectives in enacting PURPA was to encourage cogeneration and small

power production by exempting CSPPs from pervasive state rate regulation. Congress was aware that such regulation presented a strong disincentive for CSPPs to engage in power production where the financial risks were great and the returns were not guaranteed to be recoverable. The Commission, in refusing to adopt Idaho Power's proffered language was merely carrying out the directives imposed by PURPA and the implementing FERC regulations.

## II. Tenth Amendment

PURPA § 210(f) provides that "each State regulatory authority shall ... implement such [FERC] rule ... for each electric utility for which it has ratemaking authority." FERC interpreted this provision to require that:

"Such [State] implementation may consist of the issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities arising under Subpart C, or any other action reasonably designed to implement such subpart." 18 C.F.R. § 292.401 (1980).

Idaho Power argues that PURPA and its implementing FERC regulations as applied in this instance violate the tenth amendment.

In *FERC v. Mississippi, supra,* the United States Supreme Court addressed the question of whether PURPA violated the tenth amendment.[13] The Court addressed the very provision with which we are here concerned:

"Section 210's requirement that 'each State regulatory authority shall, after notice and opportunity for public hearing, *implement* such rule (or revised rule) for each electric utility for which it has ratemaking authority,' 16 U.S.C.

---

12. 18 C.F.R. § 292.304(b)(5) provides that:
"In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery."

13. The tenth amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

§ 824a–3(f)(1) (emphasis added) is more troublesome. The statute's substantive provisions require electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities. § 824a–3(a). Yet FERC has declared that state commissions may implement this by, among other things, 'an undertaking to resolve disputes between qualifying facilities and electric utilities arising under [PURPA]' 18 C.F.R. § 292.401(a)(198). In essence then, the statute and the implementing regulations simply require the Mississippi authorities to adjudicate disputes arising under the statute. Dispute resolution of this kind is the *very type of activity* customarily engaged in by the Mississippi Service Commission....

. . . .

"The Mississippi Commission has jurisdiction to entertain claims *analogous to those granted by PURPA,* and it can satisfy § 210's requirements simply by opening its doors to claimants. That the Commission has administrative as well as judicial duties is of no significance. Any other conclusion would allow the States to disregard both the preeminent position held by federal law throughout the Nation, ... and the congressional determination that the federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery...." 102 S.Ct. at 2137–38 (emphasis added).

The Commission, similar to the Mississippi Commission, has jurisdiction to entertain claims analogous to those granted by PURPA and it can satisfy § 210's requirements simply by opening its doors to claimants as was done here. The Idaho Public Utilities Law gives the Commission the power to determine utility rates, the power to resolve complaints against utilities such as the Afton complaint herein, and the power to review and establish utility contracts. As was the case in *FERC v. Mississippi,* the Commission's actions in this case are similar to its everyday ratemaking funcions which necessarily entail reviewing contracts and transactions which affect those rates. I.C. § 61–307. Contracts entered into by public utilities with CSPPs or decisions by utilities not to contract with CSPPs have a very real effect on the rates paid by consumers both at present and in the future. We hold that the Commission acted within its authority in requiring Idaho Power to contract with Afton and the decision of the Commission is therefore affirmed.

Given our holding in this case, we find it unnecessary to address the other arguments raised by the parties.

Costs to respondent. No attorney's fees on appeal.

DONALDSON, C.J., and BISTLINE, J., concur.

APPENDIX A

TABLE 2

IDAHO POWER COMPANY
POWER RATES
FOR
COGENERATION AND SMALL POWER PRODUCTION

AVOIDED CAPACITY COSTS
($/kw-year)

| Operation Date | 2 Years | 4 Years | 6 Years | 8 Years | Length of Contract 10 Years | 12 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1981 | 107 | 116 | 124 | 133 | 143 | 152 | 167 | 192 | 216 | 240 | 263 |
| 1982 | 118 | 127 | 137 | 147 | 157 | 167 | 184 | 211 | 238 | 264 | 290 |
| 1983 | 130 | 140 | 151 | 162 | 173 | 184 | 202 | 232 | 262 | 291 | 319 |
| 1984 | 143 | 154 | 166 | 178 | 190 | 202 | 222 | 255 | 288 | 320 | 350 |
| 1985 | 157 | 169 | 182 | 195 | 209 | 223 | 244 | 281 | 317 | 352 | 385 |
| 1986 | 173 | 186 | 200 | 215 | 230 | 245 | 269 | 309 | 348 | 387 | 424 |

Unit Avoided Energy Costs

As specified in Idaho's Tariff Schedule 89 on file with the Idaho Public Utilities Commission

---

BAKES, Justice, specially concurring and dissenting in part:

The primary issue raised is whether or not the Idaho Public Utilities Commission has jurisdiction to resolve the contractual dispute between Afton Energy and Idaho Power, particularly the jurisdiction and power to order Idaho Power to enter into a 35-year fixed term, fixed rate contract to purchase power from Afton. The majority finds such jurisdiction and power under the Public Utility Regulatory Policies Act (PURPA), § 210, and purportedly also finds jurisdiction based on state statutes. However, in the course of its discussion, the majority states, "Thus, it is clear that PUR-PA was intended to confer upon state regulatory commissions authority and duties not conferred under state law." I vehemently disagree with this statement.

It has apparently been established that the United States Congress can create rights and obligations between Afton and other cogenerators, and Idaho Power and similar regulated public utilities. The Supreme Court has said as much in *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), *reh. den.* 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401. How-ever, in my view the United States Congress cannot create jurisdiction in a state agency to resolve or litigate the rights and obligations between such individuals if the state entity has not been given that jurisdiction by state law. Any such attempt to create such jurisdiction by Congress would violate the tenth amendment.

The Idaho Public Utilities Commission's jurisdiction must stem from state law. The commission has no inherent power, and its powers and jurisdiction derive in their entirety from the enabling statutes, and "nothing is presumed in favor of its jurisdiction." *Arrow Transportation Co. v. Idaho Public Util. Comm'n.* 85 Idaho 307, 379 P.2d 422 (1963); *see also Lemhi Telephone Co. v. Mountain States Telephone & Telegraph Co.*, 98 Idaho 692, 571 P.2d 753 (1974).

There are no statutes in Idaho's public utilities law which give the commission jurisdiction to order Idaho Power to enter into the type of contract involved in this case. Afton Energy is attempting to enforce contractual rights granted by federal law. As we noted in *Lemhi Telephone Co., supra,*

"Generally, construction and enforcement of contract rights is a matter which lies in the jurisdiction of the courts and not the public utilities commission. This is true notwithstanding that the parties are public utilities or that the subject matter of the contract coincides generally with the expertise of the commission. If the matter is a contractual dispute, it should be heard by the courts." *Id.* at 696, 571 P.2d 753.

The majority misinterprets *FERC v. Mississippi, supra.* The majority states that "the United States Supreme Court has interpreted PURPA as imposing requirements on state regulatory authorities in excess of their duties under state law." However, a correct reading of that case indicates that the Supreme Court, in deciding whether or not PURPA violated the tenth amendment, *assumed* that the Mississippi Public Service Commission already had pre-existing state jurisdiction to resolve disputes of the type arising under the statute. In light of that assumption, the Supreme Court ruled that PURPA did not violate the tenth amendment because it simply required Mississippi authorities to adjudicate disputes of the type they already dealt with under their state jurisdiction. That court stated:

"In essence, then, the statute and the implementing regulations simply require the Mississippi authorities to adjudicate disputes arising under the statute. Dispute resolution of this kind is the very type of activity customarily engaged in by the Mississippi Public Service Commission.

. . . .

"The Mississippi commission has jurisdiction to entertain claims analogous to those granted by PURPA, and it can satisfy section 210's requirement simply by opening its doors to claimants." *Id.* 102 S.Ct. at 2137–38.

The Supreme Court's assumption that the Mississippi commission previously had jurisdiction of analogous claims may or may not be correct. However, it is clear that such an assumption cannot be made under Idaho law without a close examination of Idaho statutory law because of our previous decision in *Lemhi Telephone Co. v. Mountain States Telephone & Telegraph Co., supra.* In *Lemhi* we ruled that the commission did not have jurisdiction to rule on the obligations between those parties. Thus, jurisdiction cannot be assumed, and the only jurisdiction that can exist is that granted by Idaho law.

That is not to say that the purpose of the United States Congress when it enacted PURPA has been frustrated because Idaho has not provided a forum in which the rights and obligations between cogenerators and utilities can be litigated and settled. The dispute between Afton Energy and Idaho Power Company could have been litigated either in the state courts under I.C. § 1–705, or I.C. § 10–1201 *et seq.*, the Idaho Declaratory Judgment Act, or in the federal courts under 16 U.S.C. 924a–3(g), –(h).[1] However, it is not true that merely because the federal government has created rights and obligations between cogenerators and utilities and has provided that they may be enforced in the courts that the federal statute or regulations can grant jurisdiction to a state administrative agency which has not been given that jurisdiction by the Idaho legislature.

The majority opinion does find Idaho statutory authority for the regulation of CSPP contracts. *See supra,* p. 430. It is true that Idaho state law gives the commission the authority to supervise and regulate electric utilities and the contracts they enter into, and the facilities they construct to produce power. Arguably, then, there existed, prior to the enactment of PURPA, jurisdiction under state law for the commission to regulate contracts formed by Idaho Power to buy power from entities such as Afton. *See* I.C. §§ 61–503, 61–502, 61–501. Thus, as the majority reasons, PURPA could give the state commission authority to entertain

---

1. The public utilities commission has acknowledged in its brief, "These provisions [PURPA] could be enforced by FERC or by a CSPP in court. 16 U.S.C. 924a–3(g) and (h)."

contract claims analogous to those over which it already had jurisdiction. *FERC v. Mississippi, supra.*

However, the commission never has had jurisdiction to order an electric utility such as Idaho Power to enter into a fixed rate, long term contract which is not subject to change. The Idaho Public Utilities Commission has jurisdiction to set up a schedule of rates and require Idaho Power to enter into contracts on that basis, the schedule being subject to change for future conditions like all other schedules of power rates which the commission sets for Idaho Power. Likewise, it has authority to order modification of contracts entered into by utilities when the rates set in that contract are adverse to the public interest. *Agricultural Products Corp. v. Utah Power & Light,* 98 Idaho 23, 557 P.2d 617 (1976). But it presently has no statutory authority to compel a utility to enter into a contract for a fixed rate for 35 years which cannot be modified by subsequent commissions based upon subsequent conditions.

Idaho Power requested that the commission rule that the rates set forth in the Afton contract would be subject to the continuing jurisdiction of the PUC so that the rates could be maintained as just, fair, reasonable and sufficient. That request is consistent with the commission's duty to maintain a continuing inquiry into a regulated utility's rate structure. *See* I.C. § 61–502; *Grindstone Butte Mutual Canal Co. v. Idaho Power Co.,* 98 Idaho 860, 574 P.2d 902 (1978). In any contract which the commission compels the utility to enter into, the rate charged must remain subject to the continuing power of the commission to adjust the rate under the contract to allow for elimination of any contract provision that produces unjust or unreasonable rates to consumers served by the electric utility. I.C. § 61–502 ("Whenever the commission shall find ... that the ... contracts ... affecting such rates ... are unjust, unreasonable, discriminatory or preferential, ... the commission shall determine the just, reasonable or sufficient rates ... or contracts to be thereafter observed or in force...."); I.C. § 61–503 ("The commis-

sion shall have power ... to investigate a ... contract ... of any public utility, and to establish new ... contracts ... in lieu thereof.")

The majority rejects this continuing authority of the commission, arguing that such continuing authority would subject CSPP's to utility-like regulation, a result not desirable under PURPA. The fallacy in this assumption is clear. CSPP's like Afton Energy would not be subject to utility-like regulation merely because the commission retained jurisdiction to supervise the rates paid by Idaho Power Company. CSPP's would still be free to conduct their own operations free from commission interference, charge any rate to third parties that the third parties would be willing to pay, and make any amount of profit they wish. Their rate of return could reach 100% if that is the rate the market will bear. The commission could not supervise any of the essential elements of a CSPP's business. The only power the commission would have is to order *Idaho Power* to pay only those contract rates which produced utility rates to consumers that were just, reasonable and sufficient to maintain the proper rate of return to the utility.

As previously noted, the Idaho Public Utilities Commission has only limited jurisdiction, and nothing is presumed in favor of its jurisdiction. Nothing in Idaho statutory law gives the commission the broad authority to order a utility to enter into a fixed rate, 35-year contract. The majority attempts to interpret PURPA in such a way as to give the commission the authority to do just that. With this approach I must disagree because, as already stated, federal law cannot grant to our state commission authority to act in excess of the jurisdiction granted under state law. Federal law may well create a right in a CSPP to a long term fixed rate contract, but any such right must, under present Idaho law, be enforced in the courts and not by the Idaho Public Utilities Commission which lacks the jurisdiction and power under existing Idaho law to order such a contract.

Thus, I dissent from that portion of the majority opinion which uses federal law to grant the Idaho Public Utilities Commission jurisdiction to order Idaho Power Company to enter into the fixed term contract which it approves today.

SHEPARD, Justice, concurring.

I concur in the Court's opinion solely to the end that should a petition for rehearing be filed I may be able to, and most assuredly will, cast a meaningful vote to grant rehearing. The Court's unseemly and inexcusable rush to issue an opinion in this cause is perhaps best demonstrated by the fact that the opinion of Bakes, J. was laid upon our desks during a day of hearing cases in term and the Court's opinion was released that same day. The opinion of Bakes, J. may or may not be important, but the instant cause is of the highest importance and significance. The appearance, to say nothing of the reality, of this Court as a collegial institution has been damaged and today's action is indeed a sad commentary on the Court.

## ON REHEARING

HUNTLEY, Justice.

In our Opinion of January 11, 1984, we held that the Idaho Public Utilities Commission has jurisdiction to order Idaho Power to enter into a fixed term, fixed rate contract to purchase energy from Afton. On Petition for Rehearing, Idaho Power has asked the Court to determine the appropriate standard of review to be utilized by the Commission and this Court in cases where, as here, the utility does not voluntarily contract with a CSPP but is compelled to contract by the Commission or the mandates of PURPA.

This Court has held that tariff rates are subject to the fair, just and reasonable standard of review and contract rates are subject to the public interest review standard.[1] Idaho Power insists that the fair,

just and reasonable standard and not the public interest standard should apply in cases where the utility's contract with a CSPP is involuntary.

An agreement such as the one entered into between Afton Energy and Idaho Power, while not constituting a tariff, is a special type of contract. The Commission should apply the fair, just and reasonable standard, in a manner not inconsistent with federal law to the extent that it may be applicable, to determine whether the rates need to be adjusted in this particular type of contract. In making this determination, the Commission must consider the effect of the contract rate on the utility, its stockholders and customers and the benefits to the utility power supply system which may be realized through the development of cogeneration facilities. We emphasize, however, that whether the rate paid by the utility is fair, just and reasonable is not dependent upon the profit or loss realized by the co-generator at any given time. Our opinion today modifies our prior opinion issued January 11, 1984.

No costs or attorney fees awarded.

DONALDSON, C.J., BAKES and BISTLINE, JJ., concur.

BAKES, Justice, concurring specially:

While I disagreed with the Court's original opinion issued January 11, 1984, which held that the Idaho Public Utilities Commission had jurisdiction to order Idaho Power Company to enter into a fixed term, fixed rate contract to purchase energy from Afton, and I continue to adhere to the views expressed in my dissenting opinion filed in that case, I concur in the Court's modified opinion issued today which holds that such contracts are reviewable by the commission under the standard applicable to tariff rates, i.e., the fair, just and reasonable

---

1. *Grindstone Butte Mutual Canal Company v. Idaho Public Utilities Commission,* 102 Idaho 175, 627 P.2d 804 (1981); *Idaho Power Co. v. Idaho Pub. U. Comm'n,* 99 Idaho 374, 582 P.2d

720 (1978); I.C. §§ 61–301, 61–315, 61–503; *Agricultural Products Corp. v. Utah Power & Light Co.,* 98 Idaho 23, 557 P.2d 617 (1976).

standard of review asserted by the appellant.

SHEPARD, J., dissenting.

I joined in the dissent of Bakes, J. to the Court's original opinion of January 11, 1984, and continue to adhere to those views. I have reservations as to whether today's effort will "clarify" the views of the Court or will muddy what are already murky waters. I view today's opinion as not only modifying but totally superseding the standard of review set out in part IB of the opinion of January 11, 1984.