**Allan V. CHAPMAN, Jr., Appellant,**

**v.**

**RUDD PAINT & VARNISH COMPANY, Dave Rivers and Alan Park, Appellees.**

No. 23448.

United States Court of Appeals
Ninth Circuit.

March 20, 1969.

**638**

Nelson Christensen (argued), Seattle, Wash., for appellant.

Warren A. Doolittle (argued), of Schweppe, Doolittle, Krug & Tausend, Seattle, Wash., for appellees.

Before HAMLEY, MERRILL and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

This action involves a distributorship agreement between Rudd Paint & Varnish Company (Rudd) and Allan V. Chapman, Jr. The distributorship was for a product known as "Run-Guard," a substance designed to prevent runs in nylon hosiery. The agreement granted Chapman an exclusive distributorship in Colorado and Alaska; however, this lawsuit relates only to the Colorado business. Difficulties arose between the two parties, and Chapman brought this action against Rudd, its president and its sales director, to recover damages and obtain injunctive relief.

In the posture of the case as it reaches us, Chapman asserts two claims against defendants. One is that, in entering into the agreement, defendants, in effect, sold to Chapman an unregistered security in violation of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (1964) and The Securities Act of Washington, RCW 21.-20.005 et seq. The other claim is that, in connection with this transaction, defendants acted concertedly among themselves and with others to accomplish ends which violate section 1 of the Sherman Act, 15 U.S.C. § 1 (1964), section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13 (1964), and the Consumer Protection Act of the State of Washington, RCW 19.86.010 et seq.

During the course of the litigation the district court entered a summary judgment dismissing these claims with prejudice. Thereafter, a trial took place on other claims, relating to alleged fraud and breach of contract, which do not concern us. A judgment was ultimately entered dismissing the action. This judgment had the effect of finalizing the summary judgment referred to above. Plaintiff then took this appeal but complains only of the dismissal of the securities and antitrust claims described above.

Defendants moved initially to dismiss the appeal under Rule 3(a) of the Federal Rules of Appellate Procedure for failure to take necessary steps to perfect the appeal. The motion, which involves the failure to take steps outlined in Rule 10(b) of the Federal Rules of Appellate Procedure, is denied. Defendants' contention, made in their brief and on oral argument, that the appeal is untimely insofar as it relates to the summary judgment, is without merit.

Defendants also point out that plaintiff failed to include in the part of the record brought before this court, certain depositions which were considered by the district court in acting upon the motion for summary judgment. Defendants urge that this failure is "fatal" to a consideration of plaintiff's appeal from the summary judgment.

■ Such a failure is not automatically "fatal" to an appeal because, under Rule 10(a), all of the original papers and exhibits filed in the district court are a part of the record on appeal whether or not brought before this court. Following oral argument, and pursuant to Rule 10(e), this court directed plaintiff to file a supplemental transcript containing the missing depositions. This has been done.

■ On the merits, plaintiff first argues, in effect, that at the time the motion for summary judgment was under consideration, there were genuine issues as to material facts pertaining to plaintiff's claims based upon the above-cited federal and state securities acts. If this

is true, then the district court should not have disposed of those claims by means of a summary judgment. See Rule 56(c), Federal Rules of Civil Procedure.

Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1), provides that any person who offers or sells a security in violation of section 5 of that Act shall be civilly liable to the person purchasing such security from him. Section 5 of the Act, 15 U.S.C. § 77e, provides, in part, that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security through the use or medium of any prospectus or otherwise, unless a registration statement is in effect as to such security.

It is here undisputed that defendants made use of instrumentalities of interstate commerce and the mails, in negotiating the "Run-Guard" distributorship agreement with plaintiff. It is also undisputed that no registration statement was in effect as to the distributorship agreement in question, dated October 11, 1965. Defendants are therefore civilly liable to plaintiff if the distributorship agreement is a "security" within the meaning of the Securities Act of 1933.

■ The term "security" is defined in that Act to embrace a variety of instruments, including any "investment contract." See section 2(1), 15 U.S.C. § 77b (1) (1964). The parties are agreed that if the distributorship agreement is a "security" within the meaning of this Act, it is because it is an "investment contract." An investment contract, for purposes of the Securities Act of 1933, means "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * * *" S. E. C. v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244.

■ The distributorship agreement was before the district court. The pleadings, affidavits and depositions before the district court reveal no dispute as to the terms of that agreement. Plaintiff, however, contends, in effect, that the character and scope of the distributorship agreement are to be judged not alone by the express terms of the agreement, but also in light of a brochure which he received from defendants before he entered into the agreement.[1] But, assuming this to be true, the brochure is also in evidence, and there is no dispute as to its contents or its use in inducing Chapman to enter the distributorship agreement.[2]

We therefore conclude that, at the time the district court entertained the motion for summary judgment, there was no genuine issue as to any material fact pertaining to plaintiff's claim based upon the Securities Act of 1933.

■ However, summary judgment is not to be granted merely because there are no such issues of fact. It must also appear that, on the undisputed facts, the person making the motion "is entitled to a judgment as a matter of law." See Rule 56(c), Federal Rules of Civil Procedure. In his brief on appeal, plaintiff does not expressly contend that defendants were not entitled to judgment dismissing, as a matter of law, the claim based upon the Securities Act of 1933. Nevertheless we think this is the purport of much of his argument on this branch of the case and we shall so deal with it.

1. In his brief in this court, plaintiff puts so much emphasis upon the brochure, and gives so little attention to the distributorship agreement, that it almost seems as if he is contending that the brochure, and not the agreement, is the "investment contract." But since the brochure is not a contract in any sense, we find no merit in such an argument and therefore conclude that the brochure, at most, has relevance in construing the distributorship agreement and in determining whether there was an offer to sell a security.

2. In Los Angeles Trust Deed & Mortgage Exchange v. S.E.C., 9 Cir., 264 F.2d 199, this court held that there should be a trial on the facts. But in the case before us, as shown above, there are no disputed questions of fact on the issue of whether defendants sold plaintiff a security.

The distributorship agreement, considered by itself, neither expressly nor by implication provides that plaintiff will or may obtain profits *solely* from the efforts of defendants or others. Quite to the contrary, an initial recital and section 16 of the agreement make it clear that the distributor's function is to "carry on the sale and distribution of PRODUCT" in the specified area. And section 21 of the agreement provides, among other things, that the distributor "understands and agrees that the success of this DISTRIBUTORSHIP is directly related to the efforts of DISTRIBUTOR and therefore no guarantees of sales profits or volume can be made." (Emphasis in original) That plaintiff fully understood that he had an active role to play under the agreement is also demonstrated by the fact that, after the agreement was entered into, he returned to Colorado and, in the words of his own attorney, "vigorously commenced operations."[3]

Thus, applying the test of S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, referred to above, the distributorship agreement, standing alone, is not an investment contract, and therefore not a security within the meaning of the Securities Act of 1933.

■ However, in determining whether a particular instrument is an investment contract and therefore a security, inquiry does not necessarily stop with an examination of the instrument.[4] Where the terms of the instrument are reasonably subject to varying interpretations, the background facts, including the terms of the offer, the plan of distribution and the economic inducements held out to the prospect, are to be reviewed. S. E. C. v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed. 2d 673; S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L.Ed. 88. Moreover, the brochure is here pertinent because the Securities Act of 1933 prohibits the offer as well as the sale of unregistered non-exempt securities. See *Howey*, at 301, 66 S.Ct. 1100.

The brochure, on the basis of which plaintiff was attracted to Rudd and its distributorship plan, and on the basis of which plaintiff made an initial five thousand dollar deposit, provides the only background factor of substance to be con-

3. This active role by plaintiff is substantiated by many statements made in his deposition. For example, he testified that he had incurred expenses while carrying out advertising, promotion and merchandising activities. At another place in plaintiff's deposition the following colloquy occurred:

"Q * * * Did you consider when you make your payment to Rudd Paint that you had made an investment such as you might make in General Motors or American Telephone & Telegraph?

A No, sir. I have no jurisdiction over what General Motors or American Telephone does, but I have some jurisdiction over what I do.

Q Right. That is really the heart of of the matter, if you put money in General Motors, they take your money and invest it, and you sit back and hope to collect a return. Right?

A Right.

Q In this instance, you recognized that the success or failure of the sales of Run Guard in Colorado were primarily dependent upon your efforts, isn't that correct?

A Combined efforts of the company, with their coöperation, and myself, yes.

Q That is correct. And you were mindful of the provision in Paragraph XXI of the agreement,—excuse me. I think I have taken it, —I invite your attention to Paragraph XXI, which says, 'Distributor understands and agrees that the success of this distributorship is directly related to the efforts of the distributor, and therefore no guarantees of sales profit or volume can be made.'

A That is true.

Q You understood that when you entered into the agreement?

A Yes."

4. Nor are we bound by the parties' characterization of their legal relationship as stated in the agreement. See S. E. C. v. W. J. Howey Co., 328 U.S. 293, 300, 66 S.Ct. 1100, 90 L.Ed. 1244; United States v. Herr, 7 Cir., 338 F.2d 607, 610.

sidered in this case.[5] The brochure contains statements which seem to minimize the amount of effort which a distributor must exert, and maximize that which Rudd would contribute. Moreover, the brochure makes reference to terms which would be as appropriate in an investment contract as in an ordinary distributorship agreement.[6]

In addition, the brochure contains profit projections allegedly based on market tests and sales data, places emphasis on the past record, success and potential of Rudd, and makes reference to the assistance to be rendered the investor by that company. The brochure describes the distributorship as a "Turn-Key" operation into which the investor merely steps, whereupon he is immediately involved in " * * * a substantial and profitable undertaking with a minimum obligation on his time or resources." It enthusiastically describes Run-Guard as a revolutionary "self-serving" product.

On the other hand, the very fact that the brochure emphasizes the amount of assistance the company will provide implies that the distributor is also to contribute an effort. The brochure contains no financial data on Rudd, nor any balance sheet figures or information concerning the company's past earnings record. Read in its entirety, the brochure is not a prospectus pertaining to a security, but rather an outline of a distributorship program relating to a product to be marketed by the distributor, through his own efforts, at retail and wholesale outlets within his designated territory.

We conclude that the district court did not err in holding, as a matter of law, under the undisputed facts, that the distributorship agreement, read in the light of the brochure, is not an investment contract, and therefore not a security. Likewise, the district court did not

err in holding, by implication, that the brochure is not an offer to sell an investment contract. We therefore uphold the summary judgment insofar as it dismissed plaintiff's claim predicated on the Securities Act of 1933.

We reach the same conclusion with regard to the dismissal, upon summary judgment, of plaintiff's claim based on The Securities Act of Washington, RCW 21.20.005 et seq. The definition of "security" contained in the state act (RCW 21.20.005(12)) is identical to the definition of that term in the Securities Act of 1933, except in respect to the language relating to oil, gas and mineral rights. While the Supreme Court of Washington does not appear to have construed the term "investment contract," we have no reason to believe that it would give that term a different construction than have the federal courts in cases involving the Securities Act of 1933.

The remaining issue on appeal is whether the district court erred in dismissing, by summary judgment, plaintiff's claims based upon the federal antitrust laws, cited at the outset of this opinion, and the Consumer Protection Act of the State of Washington, RCW 19.86.010 et seq. As in the case of the securities issue, plaintiff argues that there were unresolved factual issues which precluded disposition of these claims by summary judgment. He also asserts that, on the facts before the court, the federal antitrust claims should not have been dismissed.

Plaintiff alleged in his complaint that, prior to execution of the distributorship agreement on October 11, 1965, defendants acted concertedly together, through agreement and understanding "among themselves and with other persons presently unknown to plaintiff," in various

---

5. While plaintiff makes reference to a newspaper advertisement and to asserted representations made by agents of the company during preliminary negotiations, we do not regard them as undermining, to any substantial extent, the express terms of the agreement and the express statements in

the brochure. These additional circumstances were relevant to plaintiff's fraud claim, but that claim was adjudicated against him.

6. Among terms of this kind are "investor," "investment," "investment requirement," and "investment schedule."

programs and courses of conduct to accomplish specified purposes and objectives.[7] Plaintiff further alleged that in carrying out these programs defendants, acting concertedly together through agreement and understanding "among themselves and with other persons presently to plaintiff unknown," have performed certain acts to accomplish those ends.[8]

In their answer, defendants denied these substantive allegations and also alleged that, on principles of *pari delicto* and unclean hands, plaintiff is precluded from establishing a claim under the antitrust laws. Following pretrial discovery in which, among other things, the deposition of plaintiff was taken, defendants moved for a summary judgment dismissing this claim.

In addition, defendants' brief in support of their motion for summary judgment, points to portions of plaintiff's deposition in which the latter conceded that he had no knowledge of any facts supporting such allegations. In that deposition, Chapman specifically stated that he had no knowledge of any competition within his distribution area. He testified that he knew of no one who had acted in concert with defendants with regard to the antitrust purposes, objectives and acts alleged in the complaint, as set out in notes 7 and 8 herein. He also testified that he knew of no one who would "fill in" his own lack of knowledge, and stated that if the case were to come to trial tomorrow, he would be the only witness. The motion for summary judgment was also supported by the affidavit of defendant Rivers, alleging facts which are inconsistent with plaintiff's antitrust allegations.

Plaintiff filed a brief in opposition to the motion for summary judgment, but filed no counter affidavits or other supporting factual materials. For the most part, this brief deals with plaintiff's fraud and breach of contract claims which have been adjudicated against him, and his securities claim which we have herein determined was properly dismissed. However, there is some argument made concerning the antitrust claims.

In this brief plaintiff asserts that Rex Kempton, a representative of Rudd, and Tex Ditto, a Seattle distribu-

---

7. As set forth in the complaint, these purposes and objectives were:

"(a) To control prices of and allocate sales territories of Run-Guard;

"(b) to establish accounts and customers of Run-Guard through nominally independent distribution;

"(c) to change and vary wholesale prices and other terms and conditions by threats, coercion or special agreements with one or more distributors to injure or destroy the business of other nominally independent distributors affected by the competition of such other prices, terms and conditions extended to such other distributors; and

"(d) to achieve resale price maintenance of Run-Guard."

8. According to the complaint, these acts were as follows:

"(a) Soliciting members of the public, including Investor, to make payments to defendant Rudd repayable at the rate of $9.00 per case of Run-Guard calculated upon a population basis;

"(b) soliciting and paying for referral of members of the public making such payment;

"(c) entering into contracts and agreements coupled with such payment providing for furnishing to investors or so-called distributors thereunder at no cost various and sundry brochures, printed matter and the like;

"(d) after inducing such investment and other expenditures for the benefit of defendants, reducing wholesale prices to one distributor and refusing like prices to other distributors unless such other distributors shall relieve defendants of or reduce defendants' obligation to repay such investment and to furnish such literature and the like without cost;

"(e) circulating by mail and orally making misrepresentations of prices, terms and conditions, profit potential, gross revenues and the like, recklessly, negligently and without an existing belief as to their validity; and

"(f) cancelling and forfeiting investments in the event an investor so-called distributor refuses to abide by or join in defendants' plans, purposes and policies."

tor of Run-Guard are, "sufficiently implicated" to be viewed as co-conspirators with Rudd and the individual defendants. But, since Kempton was an agent of Rudd, his activities could not establish that Rudd was engaged in an antitrust conspiracy,[9] and as to both Kempton and Ditto, plaintiff offered no factual support for this conspiracy assertion.

■ Plaintiff's brief in opposition to the motion for summary judgment also suggests that discontinuance of a nine dollar credit per case against advance deposits in connection with a revised price structure, as testified to in plaintiff's deposition, handicapped plaintiff in participating in the substantial chain store market. But absent allegations of fact, or the promise of evidence, tending to show that this was the purpose of such discontinuance, or that plaintiff was treated differently from other distributors of Run-Guard, no antitrust violation inheres in this circumstance.

Moreover, defendant Rivers' affidavit, not countered by any affidavit on behalf of plaintiff, explains that a reduction in the credit from nine dollars to $3.60 per case was a necessary part of a program to reduce the prices charged distributors by Rudd, designed to offset an unanticipated lack of consumer demand for Run-Guard. Plaintiff did not submit any affidavit disputing Rivers' allegations that at no time did Rudd attempt to control or dictate prices at which plaintiff sold Run-Guard.

■ According to the undisputed factual materials which were before the district court, plaintiff refused to agree to the credit reduction from nine dollars to $3.60 per case. It was for this reason that he was held to the original price of $34.20 per case to distributors, and was not given the benefit of the $23.04 per case which went to the distributors who accepted the reduction in credit. Considered in this context, the price differential between sales by Rudd to plaintiff

and by Rudd to other distributors, was not a violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13.

■ When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleading. As stated in Rule 56(e), his response by affidavits or otherwise must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if otherwise appropriate, shall be entered against him. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569. One against whom a motion for summary judgment is filed is therefore under a duty to show that he can produce evidence at the trial, and is not entitled to a denial of that motion upon the unsubstantiated hope that he can produce such evidence at the trial. International Longshoremen's and Warehousemen's Union v. Kuntz, 9 Cir., 334 F.2d 165, 169, n. 5.

■ It is true that summary judgment procedure should be used sparingly in complex antitrust cases involving conspiracy, where motive and intent play leading roles. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458; Tillamook Cheese & Dairy Ass'n v. Tillamook County Creamery Ass'n, 9 Cir., 358 F.2d 115, 117. But in the case before us, the antitrust issues are not complex. No genuine issue of material fact is presented in the materials before the district court. Moreover, plaintiff, against whom the motion is made, not only states that he has no knowledge of the facts alleged in his complaint, but asserts that he knows of no evidence supporting his allegations. The Supreme Court has recently held that summary judgment is properly entered in an antitrust action where there is an "absence of any significant probative

---

9. A corporation cannot conspire with its officers or agents to violate the antitrust laws. Goldlawr, Incorporated v. Shubert, 3 Cir., 276 F.2d 614, 617; Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 5 Cir., 200 F.2d 911, 914.

evidence tending to support the complaint." First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569.

Under these circumstances we think the district court correctly entertained the motion. We are also of the opinion that, under the circumstances discussed above, the district court did not err in entering a summary judgment for defendants on the federal antitrust claims.

We reach the same conclusion with regard to plaintiff's claim based on the Consumer Protection Act of the State of Washington, RCW 19.86.010 et seq. This is essentially a state antitrust act, and we perceive no basis on which summary judgment of dismissal should be granted on the federal antitrust claim, but not on the state antitrust claim.

Affirmed.