834 P.2d 850

**AFTON ENERGY, INC., a Corporation, Afton Generating Company, LP, a Delaware Limited Partnership, Pacific Star, Inc., a Corporation, Plaintiffs–Counterdefendants–Appellants–Cross–Respondents,**

v.

**IDAHO POWER COMPANY, Defendant–Counterclaimant–Respondent–Cross–Appellant.**

No. 18713.

Supreme Court of Idaho,
Boise, December 1991 Term.

March 31, 1992.

Orndorff, Peterson & Hawley, Boise, for appellant. Owen H. Orndorff, argued.

Evans, Keane, Koontz, Boyd, Simko & Ripley, Boise, for respondents. Bruce C. Jones, argued.

JOHNSON, Justice.

This is a contract case involving the interpretation of portions of a Power Sales Agreement (the Agreement) between Afton Energy, Inc. (Afton) and Idaho Power Company (Idaho Power). We decline addressing whether res judicata or collateral estoppel is applicable to a decision of the Public

Utilities Commission (PUC) interpreting the Agreement, but do address whether the trial court was correct in granting summary judgment against Afton on its claims for violation of this state's antitrust laws.

We conclude that the decision of the PUC did not foreclose the trial court's interpretation of the Agreement, but we interpret the portions of the Agreement that are at issue differently than the trial court did. We also hold that a violation of this state's antitrust laws cannot be predicated on an alleged conspiracy of a corporation, its officers, directors, and agents.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

The background of this case begins with three prior decisions of this Court. *Afton Energy, Inc. v. Idaho Power Co.*, 107 Idaho 781, 693 P.2d 427 (1984) (*Afton I/III*); *Afton Energy, Inc. v. Idaho Power Co.*, 111 Idaho 925, 729 P.2d 400 (1986) (*Afton IV*); and *Afton Energy, Inc. v. Idaho Power Co.*, 114 Idaho 852, 761 P.2d 1204 (1988) (*Afton V*).

In *Afton I/III*, the Court upheld the PUC's order directing Idaho Power to enter into the Agreement pursuant to the Public Utility Regulatory Policies Act of 1978 (PURPA). The Agreement was for a term of thirty-five years and required Afton to sell Idaho Power all "firm energy" and "dispatchable capacity" produced at Afton's wood-fired cogeneration facility. Firm energy is electricity and is measured in kilowatt-hours. Dispatchable capacity is the ability of a facility to deliver electricity and is measured in kilowatts.

By the Agreement, Afton agreed to provide Idaho Power not less than 50,471,239 kilowatt-hours of firm energy and 8,864 kilowatts of dispatchable capacity each year.

During the first year of Afton's operation under the Agreement—March 1, 1984, through February 28, 1985—Afton provided 19,440,000 kilowatt-hours of firm energy and 3,414 kilowatts of dispatchable capacity. This was approximately thirty-nine percent of the firm energy and dispatchable capacity called for by the Agreement. The Agreement required Idaho Power to pay Afton for the amount of firm energy Afton actually delivered to Idaho Power during the year. The Agreement also required Idaho Power to pay for the entire amount of dispatchable capacity—8,864 kilowatts—that Afton agreed, but failed to provide during the first year.

Appendix B to the Agreement provided:

### APPENDIX "B"

### ADJUSTMENT OF CAPACITY PAYMENTS IN THE

### EVENT OF TERMINATION OR REDUCTION

B–1 GENERAL PROVISIONS

(A) This Appendix shall be applicable in the event there is a Contract Termination or a Capacity Sale Reduction

(B) The parties agree that the amount of the payment which [Idaho Power] is to make to [Afton] for Capacity is based on the agreed value to [Idaho Power] of [Afton's] performance of its obligation to provide Dispatchable Capacity during the Term of the Agreement. The parties further agree that in the event [Idaho Power] does not receive such full performance by reason of a Contract Termination or a Capacity Sale Reduction, (1) [Idaho Power] shall be deemed damaged by reason thereof, (2) it would be impracticable or extremely difficult to fix the actual damages to [Idaho Power] resulting therefrom, (3) the reductions, offsets and refund payments as provided in this Appendix, as applicable, are in the nature of adjustments in Capacity prices and liquidated damages, and not a penalty, and are a reasonable endeavor by the parties to estimate a fair compensation for the reasonable losses that would result from such termination or reduction.

(C) [Afton] shall be invoiced by [Idaho Power] for all refund payments due under this Appendix and shall pay such amounts to [Idaho Power] within thirty (30) days after the invoice date.

(D) [Idaho Power] shall have the right to offset any amount due it against any present or future payments due [Afton].

B-2 TERMINATION OR REDUCTION DUE TO [AFTON'S] FAILURE TO PERFORM

Except in the event of Force Majeure as defined in Article VIII of this Agreement, if [Afton] fails to provide the amount of energy and Capacity specified in Article III, such failure shall be grounds for Contract Termination or a Capacity Sale Reduction in accordance with the following:

(A) [Idaho Power] may immediately suspend or reduce the Capacity payments to [Afton] for a probationary period not to exceed twelve (12) months. Such reduction or suspension of payments will be calculated so that [Idaho Power] will recover the total amount of the overpayments made to [Afton] in equal monthly amounts over the term of the probationary period. All such amounts recovered by reduction or suspension will be retained by [Idaho Power].

(1) If, during the probationary period [Afton] meets or satisfies [Idaho Power] that it can meet its obligation to supply Capacity, [Idaho Power] shall, following the probationary period, reinstate the Capacity payment.

(2) If [Afton] fails to satisfy its obligation to supply Capacity during the probationary period, [Idaho Power] may permanently derate the Capacity appropriately or terminate the Capacity purchases if no Capacity is supplied during the probationary period.

(B) In the event of a Capacity Termination [Afton] shall refund to [Idaho Power] an amount equal to seventy-five percent (75%) of the difference between the Capacity payments already paid by [Idaho Power] (based on the original term of the Agreement) and the total Capacity payments which would have been paid if the Capacity Price had been based on the period from the Operation Date to the actual date of termination.

(C) If at any time, based on appropriate tests, studies or prior performance,

[Idaho Power] determines that [Afton] will be unable to provide the agreed-upon Capacity, [Idaho Power] may immediately reduce the Capacity or terminate Capacity purchases.

(D) REPLACEMENT POWER

If, as a result of any of the events specifically defined as exceptions to Force Majeure in Article VIII [labor disputes, failure of other power companies to transfer Afton's power, and lack of fuel for Afton's facility], [Afton] will be unable to meet its obligation to provide the Capacity, [Afton] will notify [Idaho Power] and [Idaho Power] may purchase power from another source to replace the power [Afton] had agreed to provide. Such replacement power will, for purposes of satisfying [Afton's] Capacity obligation, be deemed to have been delivered by [Afton]. [Afton] will reimburse [Idaho Power] for the difference, if any, between the amount which [Idaho Power] would have paid to [Afton] and the actual cost of the replacement power, including losses, wheeling and load factoring. [Idaho Power] will bill [Afton] monthly for the reimbursement amount. Unless otherwise agreed, [Idaho Power] will not be obligated to attempt to procure replacement power for a period longer than six months. In no event will [Idaho Power] pay [Afton] for Capacity not actually provided by [Afton].

(E) The foregoing remedies are not exclusive and [Idaho Power] reserves all rights it may have against [Afton] as a result of [Afton's] failure to perform this Agreement.

On February 1, 1985, one month before the end of the first year of Afton's performance under the Agreement, Idaho Power sent Afton a letter, which included the following statements:

Based on the facility's performance to date, it is now clear that Afton will not provide the energy and capacity it agreed to provide. Therefore, pursuant to the terms of the Agreement, it is [Idaho Power's] intention to reduce the monthly payments to be made Afton.

This adjustment to the payment will be in accordance with paragraph B–2(A) of Appendix B to the Agreement. Under that section, [Idaho Power] is electing to place Afton on probation for a twelve-month period commencing March 1, 1985. During this probationary period, payments to Afton will be reduced to correspond to the average kilowatts actually provided during the March 1, 1984 to March 1, 1985 period and to recover, in twelve equal monthly deductions, the total amount of overpayments made to Afton during the March 1, 1984 to March 1, 1985 period.

Afton and Idaho Power tried unsuccessfully for several weeks to resolve how to deal with Afton's failure to provide all the firm energy and dispatchable capacity required by the Agreement during the first year of Afton's operation. Finally, on May 6, 1985, Idaho Power paid Afton for the first month of Afton's operation during the second year. Idaho Power paid Afton for the firm energy Afton delivered in March 1985, plus a reduced payment for dispatchable capacity as specified in Appendix B–2(A) of the Agreement, compensating Afton for the average monthly amount of dispatchable capacity Afton provided during the first year. From the total of these amounts, Idaho Power deducted one-twelfth of the overpayment Idaho Power made to Afton for dispatchable capacity during the first year. Idaho Power explained the calculation of this payment in a schedule that accompanied the letter transmitting the payment:

Calculation of March 1985 payment including reduced capacity payment and prior period overpayment recoveries.

| | | |
|---|---|---|
| Capacity Payment $(3,414 \text{ Kw} \times \$350.00/\text{Kw/Yr})/12$ | = | $ 99,575.00 |
| Energy Payment $(3,686,000 \text{ Kwh} \times 22.65 \text{ Mills/Kwh})$ | = | 83,487.90 |
| Overpayment Recoveries (12 month recovery period) | | (169,479.06) |
| Net Payment | | $ 13,583.84 |

During the remainder of Afton's second year of operation, Idaho Power continued to pay Afton according to similar calculations.

In the spring of 1985, Afton applied to the PUC for an order clarifying Afton's obligation to repay capacity overpayments made by Idaho Power to Afton pursuant to the Agreement. The PUC denied Afton's application.

On April 15, 1986, Afton and Idaho Power signed an amendment to the Agreement (the Amendment) providing for an extension of the probationary period. The Amendment stated that during Afton's second year of operation—March 1, 1985, through February 28, 1986—Afton provided 44,148,000 kilowatt-hours of firm energy and 7,753 kilowatts of dispatchable capacity.

Afton brought this lawsuit seeking to recover damages from Idaho Power based on several theories. Foremost among these theories was the allegation that Idaho Power breached the Agreement by exercising an illegal double recovery under both Appendix B–2(A) and Appendix B–2(C) of the Agreement: (1) Idaho Power withheld the amount it contends it overpaid Afton for dispatchable capacity during the first year of Afton's operation, pursuant to Appendix B–2(A); and (2) Idaho Power reduced the amount of dispatchable capacity for which Idaho Power was obligated to pay Afton during the second year of Afton's operation, pursuant to Appendix B–2(C).

Afton also alleged Idaho Power: (1) breached the covenant of good faith and fair dealing, (2) violated the PUC's orders, (3) retained liquidated damages under the Agreement as an unconscionable penalty, (4) was quasi-estopped to retain the amounts it withheld from Afton, (5) tortiously interfered with Afton's other con-

tracts, and (6) violated the Idaho antitrust laws.

Idaho Power moved to dismiss Afton's claims on the ground that the PUC's decision was res judicata. The trial court dismissed Afton's claim that Idaho Power violated the PUC's orders on the ground that the PUC had the primary jurisdiction to determine the alleged violations. The trial court denied Idaho Power's motion to dismiss Afton's other claims.

Subsequently, the trial court granted Idaho Power's motions for summary judgment dismissing Afton's other claims, but denied Idaho Power costs, attorney fees, and prejudgment interest.

Afton appealed the dismissal of its claims. Idaho Power cross-appealed the denial of its motion to dismiss and the denial of costs, attorney fees, and prejudgment interest.

## II.

### THE PUC DID NOT PURPORT TO HAVE JURISDICTION TO INTERPRET THE AGREEMENT.

Idaho Power asserts that Afton's contract claims are barred because the PUC ruled that the Agreement authorized Idaho Power to invoke the remedies provided in Appendix B–2(A) and Appendix B–2(C) simultaneously. We reject this contention, because the PUC did not purport to have jurisdiction to interpret the Agreement.

In its decision discussing the issue, the PUC stated:

Afton's pleading is essentially a request for reformation of its contract with Idaho Power. Although the subject matter concerns public utility law and policy, questions of contract interpretation and enforcement are normally the sole province of the courts. *See Lemhi Telephone Company v. Mountain States Telephone and Telegraph Co.,* 98 Idaho 692, 571 P.2d 753 (1977). Nevertheless, in this case both parties urge us to accept jurisdiction in order to determine whether Afton's proposal is in the public interest. Under these circumstances we

have assumed *arguendo* that the Commission has subject matter jurisdiction and proceeded to an evidentiary hearing on the complaint.

Later in its decision, the PUC found "that granting the relief requested by Afton would not be in the public interest even if this Commission has jurisdiction to enter such an order."

We decline Idaho Power's invitation to address whether the PUC had jurisdiction to interpret the Agreement, since the PUC itself did not purport to have jurisdiction to do so. The PUC merely accepted the request of both parties to interpret the Agreement. To that extent, the interpretation was only advisory, and we will not consider the question further.

## III.

### THE AGREEMENT DID NOT ALLOW IDAHO POWER BOTH TO RECOVER OVERPAYMENTS FOR DISPATCHABLE CAPACITY AND TO REDUCE THE DISPATCHABLE CAPACITY DURING THE PROBATIONARY PERIOD.

Afton asserts that the Agreement did not permit Idaho Power to declare a probationary period in order to recover overpayments for dispatchable capacity Idaho Power made during the first year of Afton's operation, and simultaneously reduce the dispatchable capacity for Afton's second year of operation. We agree.

Preliminarily, we reject two of Afton's arguments. Afton contends that the Agreement did not authorize Idaho Power to invoke the remedies in Appendix B because: (1) Afton did not fail to provide the dispatchable capacity specified in the Agreement, or (2) the force majeure provision of the Agreement excused Afton's failure.

In support of the first of these contentions, Afton relies on the definition of dispatchable capacity in the Agreement. This definition does not require Afton to provide dispatchable capacity during periods of "forced outage." Forced outage is

defined as "[a]ny outage caused by mechanical or electrical equipment failure that either fully or partially curtails the electrical output of [Afton's facility]." Forced outage, however, does not release Afton from its obligation under the Agreement to provide 8,864 kilowatts of dispatchable capacity each year. It only releases Afton from any obligation to deliver dispatchable capacity during a period of forced outage. The requirement to provide the annual amount of dispatchable capacity remains.

■ In support of its second contention, Afton points out that Appendix B–2 protects Afton from termination or a reduction of capacity if its failure to perform was the result of force majeure. The Agreement defines force majeure as "unforeseeable causes beyond the reasonable control of and without the fault or negligence of the party claiming Force Majeure," with certain specified exclusions. An event of force majeure excuses both parties from whatever performance the force majeure affects. The Agreement requires the non-performing party to give the other party written notice describing the particulars of the force majeure as soon as reasonably possible after the occurrence of the force majeure.

Afton contends that it gave notice of force majeure to Idaho Power two times during the first year of operation. Afton gave the first of these notices in a letter written in May 1984. This letter amounts to no more than a reassurance that Afton expected to fulfill the first-year requirements of the Agreement despite some early problems with Afton's delivery of the dispatchable capacity.

Afton gave the second of its purported force majeure notices to Idaho Power in a letter dated February 26, 1985—only two days before the end of Afton's first year of operation and more than three weeks after Idaho Power notified Afton of the establishment of a probationary period. The letter referred to "unforeseen engineering problems" and suggested various ways of dealing with Afton's failure to provide the required amount of dispatchable capacity during the first year of operation. The letter did not invoke the force majeure provision of the Agreement and cannot reasonably be construed as the notice of force majeure required by the Agreement.

We move on then to an interpretation of the Agreement to determine whether Idaho Power properly invoked the provisions of both Appendix B–2(A) and B–2(C) at the same time. The interpretation of an unambiguous contract is a question of law, and the ambiguity question is subject to our free review. *St. Clair v. Krueger,* 115 Idaho 702, 704–05, 769 P.2d 579, 581–82 (1989). We conclude, as the trial court did, that the provisions of the Agreement at issue here are not ambiguous. We, however, interpret these portions of the Agreement differently than the trial court did.

As we read the Agreement, Appendix B–2(A) authorized Idaho Power to reduce the payments to Afton for a probationary period not to exceed twelve months in order to recover the overpayments for dispatchable capacity made to Afton during the first year of Afton's operation. In its letter of February 1, 1985, Idaho Power declared its intention to treat the second year of Afton's operation as a probationary period for this purpose.

If Afton met or satisfied Idaho Power that Afton could meet its obligation to supply dispatchable capacity during the probationary period, Appendix B–2(A)(1) required Idaho Power to reinstate the payments for dispatchable capacity following the probationary period. Appendix B–2(A)(2) entitled Idaho Power to "permanently derate" the dispatchable capacity (and permanently reduce capacity payments) if Afton failed to satisfy its obligations to supply dispatchable capacity during the probationary period. Idaho Power could also stop the purchases if Afton supplied no dispatchable capacity during the probationary period.

These provisions create a consistent system for dealing with Afton's failure to provide the amount of firm energy and dispatchable capacity specified in the Agreement. During the probationary period, Idaho Power would recover the amount of its overpayment for dispatchable capacity during Afton's first year of operation. If Afton failed to supply the dispatchable capacity specified in the Agreement during the probationary period, Idaho Power could

permanently reduce or stop future payments for dispatchable capacity.

If Idaho Power permanently reduced its future payments for dispatchable capacity following the probationary period, Idaho Power agreed under Appendix B–1(B) that the reductions were not a penalty, but merely adjustments in the price for dispatchable capacity as a fair compensation for Idaho Power's losses. If Idaho Power terminated its future payments for dispatchable capacity following the probationary period, Appendix B–2(B) required Afton to make a refund to Idaho Power.

Idaho Power argues that Appendix B–2(C) permitted Idaho Power to reduce or terminate purchases of dispatchable capacity "at any time" if the other prerequisites of B–2(C) are fulfilled. Idaho Power claims the right to make this further reduction or termination even during a probationary period. This reading of Appendix B would destroy the meaning of Appendix B–2(A), which provides Idaho Power with the option to "immediately suspend or reduce" dispatchable capacity payments to Afton "for a probationary period not to exceed twelve (12) months."

Under Appendix B–2(C), Idaho Power may reduce or terminate purchases of dispatchable capacity "based on appropriate tests, studies or prior performance" that Afton "will be unable to provide the agreed-upon Capacity." When Idaho Power opted to reduce its dispatchable capacity payments for Afton's second year of operation, Idaho Power gave Afton the opportunity under Appendix B–2(A)(1) to meet or satisfy Idaho Power that Afton could meet its obligation to supply dispatchable capacity. If Afton did so, the Agreement obligated Idaho Power to reinstate the full dispatchable capacity payments after the probationary period. It would be totally inconsistent with this provision to allow Idaho Power immediately to reduce or stop its dispatchable capacity payments under B–2(c) during the probationary period. The probationary period would be meaningless under Idaho Power's interpretation.

Idaho Power argues that Appendix B–2(E) authorized Idaho Power both to recover overpayments by invoking Appendix B–2(A) and to reduce capacity purchases by invoking Appendix B–2(C). Appendix B–2(E) states that the remedies provided in appendix B "are not exclusive," and that Idaho Power reserves all rights it might have against Afton as a result of Afton's failure to perform under the Agreement. Idaho Power's reliance on Appendix B–2(E) is misplaced.

Appendix B–2(E) addresses a different question than whether Idaho Power may invoke Appendix B–2(A) and Appendix B–2(C) simultaneously. Appendix B–2(E) speaks to Idaho Power's employment of remedies other than those contained in Appendix B if Afton fails to perform under the Agreement. As stated in a leading annotation discussing whether a contractual remedy excludes other possible remedies:

> The question frequently arises whether a particular remedy stipulated in a contract for its breach, such as the right to rescind the contract, or to retain payments made thereunder, or to repossess or return property sold, is exclusive of other remedies afforded by law.

Annotation, *Contractual provision as to remedy as excluding other possible remedies*, 84 A.L.R.2d 322, 323 (1962).

Although a contract providing a specific remedy for breach usually must be construed to determine whether the parties intended the contractual remedy to exclude other remedies provided by law, "[n]o question of construction arises where a contract, by its terms, provides that the contractual remedy shall, or shall not, be exclusive of other remedies." *Id.* at 327. In this context, the purpose of Appendix B–2(E) is to declare that Idaho Power may exercise remedies outside the Agreement if Afton fails to perform.

## IV.

A VIOLATION OF THE ANTITRUST LAWS MAY NOT BE PREDICATED ON AN ALLEGED CONSPIRACY BETWEEN A CORPORATION, ITS OFFICERS, DIRECTORS, AND AGENTS.

Afton asserts that the trial court incorrectly dismissed Afton's claims that Idaho

Power, its officers, directors, and agents conspired to violate I.C. §§ 48–101 (Combination in restraint of trade illegal) and –104 (Unfair competition illegal). We disagree, although for a more fundamental reason that those upon which the trial court based its decision.

■ The trial court based its dismissal of Afton's antitrust claims on the resolution of Afton's contract claims and on the "state action doctrine." We find it unnecessary to address whether the trial court's analysis was correct. We conclude that Afton's antitrust claims fail because a conspiracy among Idaho Power, its officers, directors, and agents does not provide the predicate for a successful antitrust claim under the statutes of this state.

In *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 223, 646 P.2d 988, 994 (1982), the Court held that a conspiracy that violates this state's antitrust laws requires independent entities capable of conspiring. In doing so, the Court noted that I.C. §§ 48–101 and –104 are patterned after §§ 1 and 7 of the federal Sherman Antitrust Act. *Id.* at 223 n. 11, 646 P.2d at 994 n. 11 (through a typographical error, the Court referred to I.C. § 48–104 as I.C. § 48–114 in footnote 11. *See* reference to I.C. § 48–104 in the text of the opinion and in footnote 12). In *Pope*, the Court stated: "In interpreting and applying our state laws on these subjects, it is clear that while federal decisions are not binding on this Court, they do offer persuasive guidance." *Id.* at 223 n. 11, 646 P.2d at 994 n. 11.

In *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 n. 9 (9th Cir.1969), the ninth circuit stated: "A corporation cannot conspire with its officers or agents to violate the antitrust laws." *See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 82 (9th Cir.1969) (different divisions of same company cannot conspire with each other). This principle logically extends to alleged conspiracies between a corporation and its directors, and precludes Afton's antitrust claims.

## V.

### CONCLUSION.

We reverse the trial court's summary judgment dismissing Afton's claim against Idaho Power for breach of contract. We affirm the trial court's summary judgment dismissing Afton's antitrust claims. We find it unnecessary to consider the other issues presented on appeal.

We remand to the trial court for further proceedings consistent with this opinion.

We award costs, but not attorney fees, to Afton.

BISTLINE and McDEVITT, JJ., concur.

BOYLE, Justice, concurring in part and dissenting in part.

I concur in sections II and IV of the lead opinion and with that portion of section III dealing with Afton's claims regarding the force majeure provision of the agreement and whether Afton failed to provide the required amount of dispatchable capacity. I respectfully dissent, however, from the remainder of section III of the majority opinion because, in my view, an ambiguity in the contract exists which prevents resolution of this case on summary judgment.

The majority opinion interprets the contract. as precluding simultaneous application of remedies provided by Appendix B–2(A)(1) and B–2(C) because to do so would render Appendix B–2(A)(1) "meaningless." *Ante*, at 856. The effect of the majority's ruling is to hold that Idaho Power's remedies can only be exercised in the alternative.

It is well settled that the determination of a contract's meaning and legal effect are questions of law to be decided by a court where the contract is clear and unambiguous. *Galaxy v. Outdoor Advertising Inc. v. Idaho Transportation Dept.* 109 Idaho 692, 710 P.2d 602 (1985). I agree with the majority that the interpretation of an unambiguous contract is a question of law for the courts. *St. Clair v. Krueger*, 115 Idaho 702, 769 P.2d 579 (1989). However, if an agreement or contract is ambiguous, the resolution of any ambiguity rais-

es a question of fact for the trial court or jury. *St. Clair v. Krueger,* 115 Idaho 702, 769 P.2d 579 (1989); *DeLancey v. DeLancey,* 110 Idaho 63, 714 P.2d 32 (1986); *Pocatello Ind. Park v. Steel West, Inc.,* 101 Idaho 783, 621 P.2d 399 (1980). Further, where a contract is determined to be ambiguous, interpretation of the document presents a question of fact which focuses upon the intent of the parties. *See Ramco v. H–K Contractors, Inc.,* 118 Idaho 108, 794 P.2d 1381 (1990); *Luzar v. Western Surety Co.,* 107 Idaho 693, 692 P.2d 337 (1984). Likewise, as the majority opinion properly notes, the determination of whether a contract is ambiguous or not is a question of law over which we exercise free review. *See Clearwater Minerals Corp. v. Presnell,* 111 Idaho 945, 729 P.2d 420 (Ct.App.1986). In making this determination, our task is to ascertain whether the contract is reasonably subject to conflicting interpretations. *Spencer–Steed v. Spencer,* 115 Idaho 338, 766 P.2d 1219 (1988).

In reviewing Idaho Power's remedies under the contract, the trial court noted the following:

> [T]he contract itself permits the use of both the reduction of capacity payments in order to recoup an overpayment and the reduction in capacity payments. Any other interpretation seems unreasonable. The contract clearly contemplates that Idaho Power will have a right to recoup capacity overpayment and it also clearly permits the de-rating of the facility based upon "prior performance," among other grounds. Thus it may recoup an overpayment already made and avoid what would appear, based on past performance of the facility to be the almost certain problem of an overpayment for the following year. There is nothing inconsistent about the two remedies. Afton was not able to meet its dispatchable capacity requirements in either contract year one or contract year two. The overpayment for contract year one of 1.9 million dollars was a considerable overpayment, approximately sixty percent of the entire payment for the capacity payments for that year. The Power Sales Agreement permitted Idaho Power based

> upon Afton's established inability to perform in the first contract year to de-rate the dispatchable capacity payment immediately. The de-rating of the facility prevented an overpayment in contract year two. It simply does not seem reasonable that Idaho Power is obligated to continuously overpay Afton or completely terminate the agreement.

(R., pp. 844–45.)

In my view, the trial court's analysis demonstrates Appendix B is reasonably subject to conflicting interpretation and the majority's different interpretation of the same agreement serves to highlight the existence of an ambiguity. Appendix B–2(A) gave Idaho Power the option of recouping the prior year's overpayments by reducing capacity payments the following year. Appendix B–2(C) gave Idaho Power the right to de-rate Afton's capacity "immediately" and "at any time" in order to limit the likelihood of making future overpayments. As the record demonstrates, Idaho Power exercised this remedy only after Afton demonstrated its inability to meet its contractual obligations. These remedies provided Idaho Power with the means to protect two distinct interests, recouping the prior year's overpayments and limiting future payments to a level consistent with Afton's demonstrated ability to provide capacity.

At the very least, the language creates an ambiguity regarding application of Appendix B remedies. The effect of the majority's interpretation is to hold that Idaho Power's remedies as outlined in Appendix B can only be exercised in the alternative. This interpretation overlooks the express language in Appendix B–2(C) which entitled Idaho Power to de-rate Afton's capacity "immediately" and "at any time." As this Court has previously noted, "in the absence of fraud or overreaching as between parties this court cannot modify the express terms of a contract lawfully entered into by competent parties." *Miller v. Miller,* 88 Idaho 57, 396 P.2d 476 (1964) (citing *J.R. Simplot v. Chambers,* 82 Idaho 104, 350 P.2d 211 (1960)); *see also Lupis v. Peoples Mortg. Co.,* 107 Idaho 489, 690

P.2d 944 (Ct.App.1984); *Knoke v. Charlebois,* 107 Idaho 427, 690 P.2d 362 (Ct.App. 1984). In my view, the majority opinion does not adequately give weight to the express terms of the contract and implies a nonexistent "or" when referring to available remedies. This by itself should demonstrate that the contract is not clear and unambiguous.

Assuming arguendo, that the language of Appendix B is clear and unambiguous, it is my view that the trial court's interpretation is the better reasoned analysis. However, after considering the agreement as a whole, I am persuaded that Appendix B is reasonably subject to conflicting interpretation that requires ascertaining the intent of the parties and precludes resolution of this case on summary judgment.

Accordingly, to this extent I respectfully dissent from part III of the majority opinion.

BAKES, Chief Justice, dissenting:

I

First, I do not believe that the Court has adequately dealt with the possible *res judicata* effect of the Public Utilities Commission's ruling which Idaho Power asserts held that it was authorized to simultaneously invoke the remedies provided in Appendix B–2(A) and Appendix B–2(C). In April of 1985, Afton applied to the PUC for an order to modify the Power Sales Agreement and Idaho Power's action in this case. The Commission declined to assume jurisdiction over the matter stating that it had no authority to modify the rates, terms and conditions of the agreement. Thereafter, Afton filed a Petition for Writ of Mandate with this Court to compel the Commission to hold a hearing to consider Afton's application. On May 24, 1985, this Court granted Afton's petition and issued an alternative writ of mandate to the Commission to "either schedule and hold a hearing ... and thereafter make a determination on said application ...," or show cause why it should refuse to do so. The Commission complied with the alternative writ and held the hearing.

We should not now refuse to address Idaho Power's *res judicata* defense, resulting from the Commission's decision, and the jurisdictional issue on which it hinges, merely because the Court finds that "the PUC did not purport to have jurisdiction to interpret the Agreement." Certainly if the Commission did "purport" to have jurisdiction, this Court would not have felt bound, but would have decided that question for ourselves. The Commission opted to hear the petition and to make a decision regarding Afton's application. Idaho Power now asserts that the issues presented to the trial court in this case where those presented to the Commission, and therefore Afton was precluded from litigating those issues under the doctrine of *res judicata.* Our cases hold that if the Commission had jurisdiction, then their decision would preclude any jurisdiction in the district court. *West v. State,* 112 Idaho 1038, 739 P.2d 337 (1987); *Brannon v. Pike,* 112 Idaho 938, 737 P.2d 459 (1987) (if Industrial Commission has subject matter jurisdiction, the district court has no jurisdiction). Since this Court issued our writ, directing the Commission to either act or show cause, we should now determine if in fact the Commission did have jurisdiction and, if so, whether the doctrine of *res judicata* prevents Afton from asserting their claim for breach of contract.

II

Like Justice Boyle, I concur in Part IV of the Court's opinion and with that portion of Part III of the opinion concluding that Afton did not invoke the force majeure provision of the agreement, and specifically finding that Afton breached the agreement by only performing 39% of its agreed upon obligation. However, I believe that the majority errs seriously in concluding that the agreement unambiguously precludes Idaho Power from exercising its options under both Appendix B–2(A) and B–2(C). An examination of the Appendix B–2, as set forth in the majority opinion, demonstrates that the only reasonable interpretation is one where Idaho Power is allowed to exercise both options.

Afton's breach gave Idaho Power the option to terminate the contract entirely, or to reduce its obligation to buy energy and capacity which is referred to in the agreement as "Capacity Sale Reduction." Section B–2 of the Appendix, as set out on page 851 of the majority opinion, reads:

B–2 TERMINATION OR REDUCTION DUE TO [AFTON'S] FAILURE TO PERFORM

Except in the event of Force Majeure as defined in Article VII of this Agreement, if [Afton] fails to provide the amount of energy and Capacity specified in Article III, such failure *shall be grounds for Contract Termination or a Capacity Sale Reduction in accordance with the following:*

... (Emphasis added.)

In this case, Idaho Power decided on a "Capacity Sale Reduction" which is defined in the agreement as, "A reduction in the amount of Capacity provided or to be provided and purchased under this Agreement," rather than contact termination which is defined as, "The early termination of this Agreement."

Along with those two options, Sections (A)–(E) of Appendix B–2 provide a means of allowing Idaho Power to deal with the effects of Afton's breach. One effect of Afton's breach in this case was that Idaho Power overpaid Afton approximately $1.9 million in the first year. According to Appendix B–2, Idaho Power could recoup this overpayment in one of two ways depending on the option Idaho Power chose to take.

If Idaho Power decided on a "Capacity Sale Reduction," Section B–2(A) allowed Idaho Power to recoup the overpayment by "suspend[ing] or reduc[ing] Capacity payments to [Afton] for a probationary period not to exceed twelve (12) months." If Afton thereafter met its obligation during the probationary period, the overpayment would be recouped and Afton would then be entitled to a reinstatement of the Capacity payment under the agreement. This is recognized in Section B–2(A)(1). However, if Afton did not meet its obligation during the probationary period, Idaho Power was entitled to recoup the overpayment by per-

manently derating the Capacity. This is recognized in Section B–2(A)(2).

Section B–2(A)(2) also allowed Idaho Power to "terminate the Capacity purchases if no Capacity is supplied during the probationary period." Obviously, if no Capacity was being supplied Idaho Power would be unable to recoup any overpayment.

If Idaho Power decided on "Contract Termination," or if Idaho Power terminated the Capacity purchases because no Capacity was supplied during the probationary period, Idaho Power was then entitled to recover the overpayment under the terms of Section B–2(B). That Section required Afton to "refund an amount equal to seventy-five percent (75%) of the difference between the Capacity payments already paid by Idaho (based on the original term of the Agreement) and the total Capacity payments which would have been paid if the Capacity Price had been based on the period from the Operation Date to the actual date of termination."

As can be seen from the above analysis, Sections B–2(A) and B–2(B) provide a means for the recovery of any overpayments which were a result of Afton's failure to provide the agreed-upon Capacity under the contract. However, Afton's failure to provide the agreed-upon Capacity in year one was also an indication that it might never be able to produce the agreed-upon Capacity, thus resulting in continuing overpayments by Idaho Power. To prevent such continuing overpayments, Section B–2(C) allowed Idaho Power to "reduce the Capacity or terminate Capacity purchases." That section states:

If *at any time*, based on appropriate tests, studies or *prior performance*, Idaho determines that [Afton] will be unable to provide the agreed-upon Capacity, Idaho *may immediately reduce the Capacity or terminate Capacity purchases.* (Emphasis added.)

The majority states that this section is inconsistent with the probationary period of Section B–2(A) and therefore Idaho Power must choose between the two remedies. However, this interpretation ignores the

different purposes of the two sections. As shown above, Sections B–2(A) and B–2(B) provide a means of recovering overpayments already made. On the other hand, Section B–2(C) provides the means of preventing future overpayments due to the continued inability of Afton to provide the agreed-upon Capacity. ·

This distinction was recognized by the trial court which interpreted the contract as permitting:

> the use of both the reduction of capacity payments in order to recoup an overpayment and the reduction in capacity payments. Any other interpretation seems unreasonable. The contract clearly contemplates that Idaho Power will have a right to recoup capacity overpayment and it also clearly permits the de-rating of the facility based upon "prior performance," among other grounds. *Thus it may recoup an overpayment already made and avoid what would appear, based on past performance of the facility to be the almost certain problem of an overpayment the following year.* There is nothing inconsistent about the two remedies. Afton was not able to meet its dispatchable capacity requirements in either contract year one or contract year two. The overpayment for contract year one of 1.9 million dollars was a considerable overpayment, approximately sixty percent of the entire payment for the capacity payments for that year. The Power Sales Agreement permitted Idaho Power based upon Afton's established inability to perform in the first contract year to de-rate the dispatchable capacity immediately. The de-rating of the facility prevented an overpayment in contract year two. *It simply does not seem reasonable that Idaho Power is obligated to continuously overpay Afton or completely terminate the agreement.* (Emphasis added.)

As noted by the trial court, if Idaho Power was only allowed the remedy provided in Section B–2(A), Idaho Power would be forced to "continuously overpay Afton or completely terminate the contract." Such an interpretation is unreasonable. On the other hand, if Idaho Power was only allowed to "immediately reduce the Capacity or terminate Capacity purchases" under Section B–2(C), it would be unable to recover any of the overpayments already paid. This interpretation is also unreasonable.

The unreasonableness of these choices is even more pronounced in light of the fact that it is Afton who is in breach of the contract. Because Afton breached the contract, Idaho Power could have terminated the contract entirely and sued Afton for breach of contract under Section B–2(E), thus recovering not only the overpayments made to Afton but any damages resulting from Afton's failure to provide the agreed-upon Capacity. Given this option available to Idaho Power, it is not unreasonable to allow Idaho Power to recoup the overpayments already made by reducing the Capacity payments as allowed in Section B–2(A), in addition to preventing any further overpayments by reducing its Capacity purchases as allowed in Section B–2(C). In fact, by not allowing Idaho Power to reduce its Capacity purchases under Section B–2(C), the majority is requiring Idaho Power to perform under the original terms of the contract. This is, in effect, allowing Afton to enforce the terms of that contract while at the same time being in substantial breach of the contract. Such a situation should not be allowed. *See Ellis v. Butterfield,* 98 Idaho 644, 570 P.2d 1334 (1977); *Nelson v. Hazel,* 89 Idaho 480, 406 P.2d 138 (1965) appeal after remand, 91 Idaho 850, 433 P.2d 120 (1967); *Windward Partners v. Lopes,* 640 P.2d 872, 874 (Hawaii App. 1982) ("It is basic contract law that one party cannot insist upon the performance of a contract or a provision thereof where he, himself, is guilty of a material or substantial breach of that contract or provision."); *Tel–Radio Transport Corp. v. Cantrell & Cochrane Corp.,* 43 Ill.App.2d 84, 192 N.E.2d 584, 587 (1963) ("[O]ne of the basic principles of contract law is that a party who himself has breached an agreement cannot recover under the agreement.").

Accordingly, the only reasonable interpretation of the agreement in this case is that Sections B–2(A) and B–2(B) give Idaho

Power a means to recover any over-payments made to Afton in the first year. Since Idaho Power chose not to terminate the agreement but rather opted on the "Capacity Sales Reduction," Idaho Power's means of recoupment of the overpayment was through Section B–2(A) which was done in this case. It is clear from the record that Idaho Power felt that Afton would be unable to provide the agreed-upon Capacity based on its performance during the first year. As such, Section B–2(C) also allowed Idaho Power to reduce the Capacity as to prevent any future over-payment. The two sections are not inconsistent but rather provide a complete remedy to resolve the effects of Afton's breach. This was recognized by the trial court and its decision should be affirmed.